### THE "ELEVATOR CASE."

KANSAS CITY ELEVATOR Co. *v.* UNION PACIFIC Ry. Co. and others.

UNION PACIFIC Ry. Co. and others *v.* KANSAS CITY ELEVATOR Co. and others.

*(Circuit Court, W. D. Missouri, W. D.  May, 1881.)*

**1. LEASE—FORFEITURE—RE-ENTRY.**
    The right of a lessor to determine, without recourse to the courts, a lease of real estate as forfeited, and re-enter upon the premises, is a harsh power, and it is the duty of the court to restrain it to the most technical limits of the terms and conditions upon which the right is to be exercised, and a court of equity, when necessary, when this power has been exercised, will come in and afford relief.

**2. SAME—CONDITION PRECEDENT—TAXES AND RENTS.**
    Where a lease provides for re-entry upon failure to pay taxes and rents, a demand for the payment of such taxes and rents is necessary as a condition precedent to the right of re-entry.

**3. SAME—SUBLEASE.**
    Where a lease contains a provision that the lessee shall "not sublet, nor assign or transfer this agreement, without the written consent thereto of the superintendent" of the lessor, the lessee may either sublet or assign, with the assent of the officer named; and where, during two or three months of the term, the property was turned over to another without the assent of the lessor, by acquiescing, and failing to object for a considerable period of time, the breach of the agreement will be considered as waived by him.

**4. SAME—RECEIVER—SUPERINTENDENT.**
    Under such a lease, the superintendent appointed by the receiver, into whose hands the railroad company, the lessor, has passed, is to be regarded as the superintendent, and his assent to a sublease will be sufficient.

**5. SAME—POOLING ARRANGEMENTS.**
    When a party seeks to declare a contract forfeited by an act of his own, he must point out specifically some clear act, in violation of the terms thereof, which authorize said forfeiture, and in this case the alleged pooling arrangements on the part of the lessees are not sufficient to constitute a breach of the agreement that it "will use the premises for no other purpose than a legitimate business," and will charge only reasonable and compensatory commissions.

In Equity:
*Gage & Ladd* and *Karnes & Ess,* for the elevator company.
*J. P. Usher, A. L. Williams,* and *Charles Monroe,* for the railway companies.

Miller, J., (*orally*.) We will proceed this morning to dispose of what is called the "Elevator Case," which has occupied several days in argument.

I shall not be able to-day to deliver any but a very brief opinion.

There are two bills. One is brought by the elevator company, the main purpose of which seems to be to prevent the railway company from pulling down and removing the elevator itself. No other relief is asked, except that the railway company shall be enjoined from pulling down, or tearing down, and removing the elevator.

The other is the bill of the railway company, and it states the reasons why they entered on the ground which is the subject of controversy. They justify their act by reference to the power which the lease or contract under which the elevator company held conferred upon them, being the right of re-entry. And they ask a declaration or decree that their act, in that particular, shall be affirmed, and their right to re-entry shall be held to be valid. That is the substance of the relief asked in this case. There is no prayer for damages, or compensation, or restoration of possession, or anything of that kind, which will shorten very much the consideration of the case.

We are to consider the sufficiency of the reasons alleged by the railway company for its re-entry upon the ground which it had leased (for I think the instrument is a lease) to the elevator company.

There are several of these reasons. I do not feel called upon to go into any lengthy discussion of them.

The first two of them are that the elevator company had failed to pay its rent, and had failed to pay its taxes, according to the terms of the instrument. I am quite satisfied that neither in regard to payment of rent, nor in regard to payment of taxes, was there any sufficient foundation for declaring the lease forfeited, or for the exercise of the power of re-entry on the part of the railroad company.

As a proposition pervading this doctrine of the right of re-entry by the forfeiture of a lease of land, it is to be observed that the power to be exercised is a very strong power, and it is one which is exercised without the judgment of a court of justice or of anybody else but the party who is exercising it. The party determines for himself whether he has the right of re-entry, without any resort to a court of justice. This is always a harsh power. It has always been considered that it was necessary to restrain it to the most technical limits of the terms and conditions upon which the right is to be exercised. Hence it is that the old common law provided in this class of contracts that it was the duty of the court to see that no injustice was done. It is reasonable, it is natural, that when a contract puts into the power of one man to say that under certain contingencies, of which he is to be the judge, he shall enter upon the house or home or property of another, and eject him instantly, and take possession,—it is reasonable, it is proper, that the contract and the acts which justify such a course of conduct should be construed rigidly

against the exercise of the right. A court of equity, when necessary, when this power has been exercised, will come in and afford relief.

In regard to the taxes and rents, the law is well settled, I think, that a demand for the payment thereof is necessary as a condition precedent to the right of re-entry.

The next proposition upon which the re-entry in this case depended is that there was a period of two or three months during which this elevator was run under a verbal lease, without the approval of the railway company or any of its officers. It is sufficient to say, as to this, that if it was provided by the lease that this elevator should be kept in the hands of the original parties, (as it probably was,) it seems to us that the time which elapsed before the railroad company undertook to enforce their rights under that breach of the terms of the lease is enough to condone or waive it. If the written lease under which Mead & Templer held the property is a valid instrument, and if the approval of the superintendent is a valid approval, they waived the former use of it for a month or two by the same parties prior to the execution of that lease.

The next question is whether the parties forfeited their lease from the railway company by the making of a lease to Mead & Templer. The argument (and it is a very ingenious one) is that, under this seventh clause of the original lease between the elevator company and the railway company, there was no power to lease or sublet at all, and that the approval and consent of the superintendent were with relation to allowing an assignment of the contract. The article reads as follows:

"And the said party of the second part further covenants and agrees that it will not sublet said elevator and warehouse, nor assign or transfer this agreement, without the written consent thereto of the superintendent of the party of the first part, and that it will not use said building for any other purpose than that contemplated by the terms of this contract."

It is said that the meaning of that is that they will not sublet the elevator at all, and that they can only assign upon the written consent of the superintendent of the railway company. As I stated before, I cannot enter into a full discussion of these questions, but it is sufficient to say that, in my opinion, it embraces the subletting, and that it may be done with the consent of the officer named in the instrument.

This sublease to Mead & Templer did have the approval of a man who said on the back of it that he was the superintendent. The only question is, was he such superintendent? It is said that he was not the superintendent of the company, because the railway had been put into the hands of receivers, who exercised general control over the road and its property, and that this man, Mr. Oakes, who approved of the instrument, was the superintendent of the receivers, and not the superintendent of the company. I think that his approval was sufficient to justify the lease in this case. This railway

company existed when this contract was made with an officer known as superintendent, and among his duties it was specially stated in the by-laws of the company that he should have charge of all the property and depots of the company. It is my opinion that when the former superintendent resigned or was removed, and the receivers were appointed, and they appointed Mr. Oakes superintendent, that he was the legal superintendent of that road, with the power to exercise those very functions that the prior superintendent had possessed; that his acts in pursuance thereof were properly and legally the acts of the railway company. That simply means that the lawful superintendent of that railway corporation at that time was Mr. Oakes. Therefore, I think that the sublease was a valid lease, and creates no right of re-entry on the part of the company.

I do not think it is necessary to enter into an inquiry as to whether this lease, in the nature of its terms, is *ultra vires,* or beyond the power of the company, or not.

The argument now is that this lease was to run for 20 years, and that the probability was that the company would need the land for the ordinary uses of the railroad, and that, therefore, it had not the power of putting this land out of its *control.* This argument is not sound. The company owned the land, and, not having any immediate use for it, it made a lease, fixing its own terms and the time when it could resume possession, and it is not, according to the law, for it to turn around now and say that they need the land. All the doctrines of contracts, all the doctrines of the rights of corporations, are opposed to it.

I do not recollect now of any other but one proposition that has been urged. One other ground has been urged as supporting the right of re-entry, and to declare the instrument forfeited; that is, the pooling arrangement which the elevator company entered into. What that arrangement was is not very definitely stated. All we know is that it was a contract, one clause of which is pointed out as authorizing the party to re-enter, in consequence of such contract, upon the ground that it violates the fifth clause of the original lease between the elevator company and the railway company, which says:

"And said party of the second part further covenants and agrees that it will use said premises for no other purpose than a legitimate business of receiving and forwarding grain, and that it will charge for storage and delivery of grain from said elevator only reasonable and compensatory commissions, and such as may be charged for like service at other elevators of similar character at Kansas City, and that it will in every way accommodate and serve shippers and the general public, so as to transact its business, to the best of its ability, to the satisfaction of the patrons of said party of the first part."

As I said before, when a party seeks to declare a contract forfeited by an act of his own, he must point out specially some clear act in violation of the terms of the lease which authorizes said forfeiture.

This pooling may be a very bad business; it may be very wicked; it may be as wicked as counsel represent it to be; but by the terms of the agreement such wickedness is in no way made a reason for the forfeiture of this lease. Besides, in regard to this clause, the only point is that it is provided that "said elevator will receive and deliver grain for reasonable and compensatory commissions." There is no proof in this case that they ever refused to do so. The proof, on the contrary, is that the commission they received was reasonable. Here is an agreement under which a forfeiture is claimed on the ground that there must have been exorbitant charges by the elevator company. But the railroad company have attempted to make no such proof here; and the proof on the other side negatives it; and there is no proof that they ever made any but reasonable and compensatory charges. It may be that this pooling arrangement confers rights that may be maintained in other cases and other suits, but it did not confer the right of re-entry. This is not the proper place for me to consider that question. It may come up hereafter in another shape in other suits. All that I have to say now is that the provisions of the lease have not been violated so as to forfeit the lease *ipso facto*.

I want to call the attention of counsel to what seems to me to be an error in regard to the rights assumed as growing out of these suits. I have already said that the right of re-entry and forfeiture, in regard to the terms of the lease, is a right which the courts at common law dealt with very rigidly and strictly, while a court of equity very often sets aside and restores the parties to their former position, and refuses compensation for any damage done. There is, however, a different mode of proceeding to declare the lease forfeited. When either party, lessor or lessee, claims that acts have been done which render the continuing of the relation no longer proper, such party can go into a court of equity, on general principles, and ask to have that lease set aside, canceled, and annulled. In that case the court of equity sits holding the scales of justice evenly between the parties, and may say that it believes that such acts have been done by the lessee, for instance, as ought to terminate the agreement, or that he shall account by compensation and by payment of damages. And the court will declare the agreement at an end, and set aside, and annulled, and will make such orders as seem proper and right. So a party might bring an action for ejectment or for forcible entry and detainer, and these questions might be submitted to a jury and the rights of the parties determined. But in this case the railway company has gone with a high hand and asserted its rights with a strong power. And the question, and only question, to be considered here is whether it was justified. They did not bring an action in which the question of the pool might be considered, but they have simply stated certain reasons why they entered,—why they exercised this power of re-entry; and they ask that their action be approved,

and their possession quieted. Now, as to this question of pool, whether there is any reason in it, or whether it amounts to anything, is not for me to say in this case. It is not a defense for their having taken forcible possession of this property.

The result of these views is that the prayer of plaintiff's bill, asking that the railway company be restrained from tearing down and removing the elevator, will be granted, and the temporary injunction will be made perpetual. A declaration will be made that there is not sufficient ground for the railway company to exercise the right of re-entry. And the bill of the railway company will be dismissed.