### HEATON–PENINSULAR BUTTON–FASTENER CO. v. EUREKA SPECIALTY CO. et al.

(Circuit Court, W. D. Michigan, S. D.   January 22, 1895.)

PATENTED MACHINES—SALE—RESTRICTION IN USE — PUBLIC POLICY — INJUNCTION.

Though a patentee sells button fastening machines made in accordance with his patent, with a stipulation that in them shall be used, for the purpose of fastenings, only the staples manufactured by patentee, but not in

themselves patented, one who manufactures and sells staples to the purchasers of the machines to be used therein will not be enjoined as a contributory infringer, the restriction on the use of the machines being against public policy.

Suit by the Heaton-Peninsular Button-Fastener Company against the Eureka Specialty Company and others.

Sweet & Perkins (Lange & Roberts, of counsel), for complainant. Taggart, Knappen & Denison, for defendants.

SEVERENS, District Judge. The bill is filed to restrain the alleged infringement of rights claimed to be possessed by the complainant under certain patents issued for inventions in button-fastening machines. The pith of the allegations is that the complainants, being the owners of said patents, do not sell the machines manufactured under them, outright, but with a condition, and that they attach to each machine, when they sell it, a conspicuous plate or tag, on which there is expressed a restriction to the effect that the machine was sold and purchased to use only the staples employed for fastening made by the owner of the patent, and that every user of the machine has full notice of this restriction; that the defendants, notwithstanding this, and with knowledge of these facts, manufacture staples adapted only for use in the machines so sold by the complainants, and persuade the users of the machines to buy and use them in violation of the above-mentioned restriction. To this bill the defendants have demurred. The two principal objections to the bill which have been argued, and to which this opinion will be limited, are (1) that as the defendants are not engaged in the business in which the machines are employed, and are only concerned therewith in selling to those who are so employed a nonpatented article,—an article which constitutes no part of the patented thing,—they are not accountable to the complainant; (2) that the restriction which the complainant puts upon the uses of these machines, whereby a monopoly in an unpatented article is secured to the complainant, is contrary to public policy, and that a court of equity will not enforce it.

In support of the first objection, it is urged that the cases cited by the complainant to show that parties held guilty of contributory infringement should be restrained were cases in which some part of a patented article was sold to another, with intent that it should be combined with other elements to make up the infringing article. I am not clear, however, that this distinction can be maintained upon the allegations of this bill, which are very broad and emphatic in asserting, not merely that the defendants make and sell the staples, but that they actively persuade the users of the machines to violate the supposed rights secured to the complainant by the patent, and the restriction in the sale of its machines. It would rather seem that, if the complainant has such rights as it asserts, the defendants would, upon such facts, be tort feasors, and that equity would restrain them, in the circumstances alleged.

But, upon the second ground, I think the demurrer should be sus-

tained. The question involved is a novel one, and depends upon considerations of a fundamental nature. A very able and ingenious argument has been submitted to the court to vindicate the general proposition that a patentee may deal with his patent as he likes, and that the right is absolute. These three steps are taken by counsel in their argument: (1) A patentee has an exclusive right in his patented invention, and may arbitrarily control its manufacture, sale, and use in any conceivable manner. (2) In the case at bar, the users of Peninsular machines infringe complainant's patent rights when they use the patented property outside of the bounds of the authorized use. (3) The defendants, by furnishing to those users the means whereby their infringement is committed, with intent that it shall be committed, are liable as contributory infringers. But I am persuaded that the patentee's privilege has its limitations, in the rights and interests of the public, and that it is an abuse of his privilege to so shape his dealings with his patent as to secure a monopoly upon an unpatented article. It is hard to foresee to what extent such schemes might be carried, if patents can practically be broadened so as to gather in a multitude of subjects now and always hitherto free from monopoly. The perversion is complete in the instance of the present case. The complainant claims in its bill that it makes nothing in the sale of its machines, and that the entire profits of its business are made in the sale of staples. Manifestly, such a result is wholly inconsistent with the spirit and object of the patent laws, and would constitute an excrescence thereon. It is doubtful, also, whether the restriction which the complainant puts upon its customers is enforceable upon general principles. No price is fixed at which it will supply the staples. That may be arbitrarily determined afterwards by the seller, or he may choose not to sell at all. The validity of such collateral stipulations introduced into a contract of sale of rights secured by patents is discussed, both upon the grounds of public policy, and of the uncertainty of the elements of the stipulation, in the case of Manufacturing Co. v. Gormully, 144 U. S. 224, 12 Sup. Ct. 632; and, although the particulars of that case are not precisely analogous to the facts here, the principles there adverted to have application here, and seem to support the views I have expressed. If the staples were themselves the subject of a valid patent owned by the complainant, the case might be different, as was pointed out in the case of Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co., 152 U. S. 425, 14 Sup. Ct. 627. But they are not. They are no part of the machine, and, like the paper in the case last cited, are used up by their first employment. But it is argued that the complainant, having an absolute property right under its patent, might altogether refrain from putting its machines upon the market, and in that case neither the defendants nor the general public would have any interest in the making of such staples, for they would be of no use; and judicial utterances are cited to show that the patentee may, if he pleases, withhold his patent from public use during the whole period for which his monopoly is granted. I greatly doubt the correctness of that proposition, as thus broadly stated. It seems to me that such a course

would defeat the just expectation of the public, and would not be consistent with the implications of his grant. The expectation is that he will promptly disclose the nature of his invention, and accord to the public, on reasonable terms, the use of it, and not that others should be shut out of that field for the period of 17 years, and the public be debarred from the benefits of like inventions during that whole period. Nor did congress intend any such result, depending probably upon the supposed interest of the patentee in putting his invention to profitable uses. It may be that the technical right claimed exists, in the absence of any specific provision for compelling the patentee to do what is expected from him, or forfeit the grant, and that Judge Blodgett was wrong when he said in Hoe v. Knap, 27 Fed. 204, 212, that, "under a patent which gives a patentee a monopoly, he is bound either to use the patent himself, or allow others to use it on reasonable or equitable terms," if by that he meant to state it as an absolutely binding obligation, which I doubt; but I think a court of equity would be slow in lending its aid to such a course, and would only do so in a clear case, and where the right asserted is not clouded with other objections, and perhaps that is all Judge Blodgett really intended to say. In order to justify the refusal of a court of equity to award an injunction, it is not necessary to deny that a strictly legal right exists. Said Mr. Justice Brown, in delivering the opinion of the court in Manufacturing Co. v. Gormully, above cited:

"From time immemorial, it has been the recognized duty of such courts to exercise a discretion; to refuse their aid in the enforcement of unconscionable, oppressive, or iniquitous contracts; and to turn the party claiming the benefit over to a court of law. This distinction was recognized by this court in Cathcart v. Robinson, 5 Pet. 264, 276, wherein Chief Justice Marshall says: 'The difference between that degree of unfairness which will induce a court of equity to interfere actively, by setting aside a contract, and that which will induce a court to withhold its aid, is well settled. 10 Ves. 292; 2 Cox, Ch. 77. It is said that the plaintiff must come into court with clean hands, and that a defendant may resist a bill for specific performance by showing that under the circumstances the plaintiff is not entitled to the relief he asks. Omission or mistake in the agreement, or that it is unconscientious or unreasonable, or that there has been concealment, misrepresentation, or any unfairness, are enumerated among the causes which will induce the court to refuse its aid.'"

A bill for an injunction, since it invokes the discretion of the court, is subject to the same objections. 2 Story, Eq. Jur. § 959a. The demurrer will be sustained, and the bill dismissed.