### CORTELYOU et al. v. CHARLES ENEU JOHNSON & CO.

### BRODRICK COPYGRAPH CO. OF NEW JERSEY v. SAME.

(Circuit Court, S. D. New York.  May 30, 1905.)

1. PATENTS—CONDITIONAL SALE OF PATENTED MACHINE—VALIDITY OF RESTRICTION ON USE.

It is competent for the owner of a patent for a rotary neostyle, used for stencil duplication, to sell such machines under a license restriction that they shall be used only with paper and ink made by the licensor, it being necessary to the successful operation of the machine that such supplies shall be of a special kind and quality, and any use of the machine with other supplies will constitute an infringement of the patent.

2. SAME—NOTICE OF CONDITION.

In such case a written contract of license embodying such restrictions is not necessary, but purchasers and users are bound by a notice thereof placed conspicuously on the machine itself.

3. SAME—CONTRIBUTORY INFRINGEMENT.

A defendant who, with knowledge that a patented machine is sold subject to a license restriction that it is to be used only with supplies made and sold by the licensor, induces such licensees to violate such restriction and infringe the patent by buying and using with the machine supplies made by himself, is chargeable with contributory infringement.

[Ed. Note.—Contributory infringement of patents, see note to Edison Electric Light Co. v. Peninsular Light, Power & Heat Co., 43 C. C. A. 485.]

In Equity.

This is a suit in equity brought in the first instance by Mary V. Cortelyou and another, administrators, etc., and Neostyle Company against Charles Eneu Johnson & Co., for the alleged infringement of letters patent No. 584,787, granted June 22, 1897, to Lowe and Cortelyou, covering the machine known as the "rotary neostyle." The administrators aforesaid, at the time the action was brought, owned the legal title to the patent, and the Neostyle Company was licensed under that patent. The original bill was filed November 15, 1902. February 28, 1903, the rights of the administrators were acquired by the Brodrick Copygraph Company, and then was filed a bill in the nature of a supplemental bill bringing in that concern as a party in interest. An answer has been filed to both bills, and the two causes have proceeded as one, under a stipulation to that effect. The license contract of the Neostyle Company is in evidence. The defendant is not charged with a direct infringe-

ment of the patent in suit, either by the making, the using, or the selling of the patented machine. The defendant is charged with contributory infringement, in that it has, it is alleged, procured the complainants' vendees to directly infringe by the illegal use of the machine; that is, by the use of the machine outside of the right and the scope of the authority conferred upon them.

Samuel Owen Edmonds (Edmund Wetmore, of counsel), for complainants.

Francis T. Chambers and Jefferson Clark, for defendant.

RAY, District Judge (after stating the facts). The patented rotary neostyle is sold under a license restriction, which restriction precludes the use thereof except with supplies (stencil paper, ink, etc.) manufactured and sold by the Neostyle Company. The charge is that the defendant has been making duplicating ink and selling the same to the complainants' vendees or licensees, with the intent that such ink shall be used on these machines obtained of the complainants by such vendees or licensees in violation of the license restriction. It is charged that the defendant in fact procures such ink to be so used by such licensees.

The rotary neostyle was the first machine on the market adapted for rapid stencil duplication, and is the only duplicating machine of the rotary type ever marketed. Its use was commenced in 1899, and soon passed into the hands of the Neostyle Company. At that time the machines were sold without any restrictions as to their use. In a short time that plan of sale proved to be impracticable, because the excessive cost of selling left no profit. In fact, there was a loss. The machines were not being at all times successfully used, because of the inferior supplies offered and furnished by outsiders to the users of the machine. It was also discovered that several improvements on the machine were necessary to make it complete. If the machine was to prove a success, it was necessary that it be operated efficiently and economically, and, that this result might be attained, it was necessary that the machine should be used in the manner contemplated by the manufacturer. Its use in a different manner, as with stencil paper adapted for a hand duplicator or with ink adapted for a printing press, would speedily bring the machine into disrepute. In October, 1899, it was discovered that the plan of selling the machine outright and without a license limitation was disastrous; money was being lost by the manufacturers and sellers, and the machine was falling into disrepute because of their failure to secure high-class work. This failure was due, in some degree at least, to the supplies used. It was deemed unwise to increase the price of the machine. The plan was then formed of selling the machine under a license restriction. The machine was improved, and placed in the hands of users at the price of $50, the same before charged; but each machine, it is asserted, was sold under and with a license restriction forming a part of the contract of sale, and limiting the right of the purchaser to use the same. The purchaser, it is insisted, acquired the right to use the machine only in connection with the specially developed supplies of the Neostyle Company, its ink being one of these supplies. The

baseboard of the machine, a most conspicuous part of the mechanism, is black, and upon this, before the sale of the machine, was firmly affixed in a conspicuous place a white celluloid plate, on which was and is inscribed, in black letters, the following:

"License Agreement.

"This machine is sold by the Neostyle Co. and purchased by the user, with the express understanding that it is licensed to be used only with stencil paper and ink (both of which are patented), made by the

"Neostyle Company,
"New York City."

This license agreement was affixed to each and every machine sold subsequent to October 21, 1899. Each machine bore also the patent label, giving the date of the Lowe patent in suit. This tag read as follows:

"Rotary Neostyle, U. S. Pats., July 9, 1895; Jan. 28, '96; June 22, '97. Made by Neostyle Co., New York."

This plate, giving the patents, etc., was of metal about $2\frac{1}{2}$ inches long and $1\frac{1}{4}$ inches wide, and the letters named were placed thereon in raised gilt.

The supplies for this machine are duplicating ink and stencil paper. The manager of the Neostyle Company says that the company expended large sums of money in bringing these supplies to the highest possible standard, and that they employed at great expense expert chemists, and expended months of labor and thought, to perfect an ink that would give satisfaction in any temperature and climate, and permit the user to secure the best possible results under all climatic conditions. The president of the company says that much time and labor and experience were thrown into experiments on the ink to be used on the machine, as well as in the reconstruction of the machine itself. He says that chemists and ink manufacturers were employed to secure an ink that would give the highest and best results. He says that the use of satisfactory ink on the machine means more than the production of perfect prints; that the ink must dry readily, and not act to destroy the stencil. He says that other inks were found to destroy the stencils. It must be conceded that the success of the machine would depend largely upon the quality of the work done, and that the quality of the work done would depend largely upon the quality of the supplies used. In short, it appears that the complainants, having lost large sums of money, and being in danger of having the machine brought into disrepute so that it would be worthless, expended large sums of money in improving the machine and other large sums of money in producing first-class supplies, and that then, to make the venture a success and insure a proper working of the machine and good results, they attached to each machine, before selling the same, the license agreement before quoted, and to which attention has been called. The evidence shows that good results came from this plan. The testimony shows that this plan of selling and using and operating has been beneficial both to the company and the purchaser and user of the machine. It has resulted

in profits to the company, and the highest result in quality of work has been attained. It is also shown that the ink used under this plan has saved from 30 to 40 per cent. of what would otherwise be the initial cost of the machine. The evidence is that the present selling price of the rotary neostyle machine is $50, but that its cost to the manufacturer is about $64. The evidence shows, therefore, that the manufacturer or complainants put into the hands of the purchaser or licensee, whichever we call him, a machine costing $64, at a cost to him of $50, but with the agreement attached, specified heretofore as the "license agreement," that the purchaser or licensee shall only use the machine with the supplies made and sold by the complainants. The evidence shows also that the user of the machines, operating them with the supplies made and furnished by the complainants, may receive or get back the price paid for it in about three weeks. The evidence shows that the cost of producing 1,000 typewritten copies of a writing, letter size, on the rotary neostyle, is about 33 cents. The cost of 1,000 copies of the same produced on a printing press is about $3. Other benefits derived might be named and specified, but it is unnecessary. There is a sufficient consideration to the buyer of the machine, or licensee, for the license agreement. The price charged by the company for duplicating ink is fair and reasonable. In selling the machines with this license agreement attached in the manner described, there is no fraud, deceit, or imposition. After some of these machines were sold with the license agreement attached, it was discovered by the complainants that some of them were not doing satisfactory work. On investigation it was found that some of the purchasers and users of these machines had violated the license agreement and were purchasing and using other ink, either of the defendant, or of parties who were selling the defendant's ink. The defendant's ink is inferior to that of the complainants for use upon the rotary neostyle. It is shown that the defendant itself is a party to this violation of the license agreement. The complainants contend that this license restriction and agreement is valid and binding upon the purchasers and users of the rotary neostyle, and that the use of inks made and sold by others is a violation of the license agreement and an infringement, and that all persons who make and sell, or who sell to the purchasers and users of the rotary neostyle, ink made by parties other than complainants, are contributory infringers. The defendant denies infringement, and denies the validity of the license agreement hereinbefore set out in full.

We start here with the proposition that the complainants have a valid patent, and, so far as this case is concerned, the exclusive right thereto, and to the invention covered thereby—to keep, lock up, hide, use, or sell. They may use it themselves and refuse the privilege to any one else. It is theirs, like the dollar of the one who has earned it, and they have the exclusive right to it; the right, as has the owner of the dollar, to throw it in the ocean or to bury it in the earth; the right to put at interest, or to let it lie idle and wholly unproductive. This right in the owner of a patent continues during the life of the patent. When it dies the invention becomes

138 F.—8

public property. This is the policy of the law. Its wisdom has been demonstrated by a century of experience, which has seen the inventive faculties and genius of our people developed to a marvelous extent. We lead the world in invention. The purpose of the law is monopoly for a limited time for the protection and encouragement of the inventor, as well as of others of a mechanical and inventive turn.

In Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058, it is said in the syllabus:

"The object of the patent laws is monopoly, and the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee, and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts; and the fact that the conditions in the contracts keep up the monopoly does not render them illegal. The prohibition was a reasonable prohibition for the defendant, who would thus be excluded from making such harrows as were made by others, who were engaged in manufacturing and selling other machines under other patents; but it would be unreasonable to so construe the provision as to prevent the defendant from using any letters patent legally obtained by it and not infringing patents owned by others."

The same language is found in the opinion at page 91 of 186 U. S., page 755 of 22 Sup. Ct. (46 L. Ed. 1058). In that case the court cites with approval the language of Judge Nelson in Wilson v. Rousseau, 4 How. (U. S.) 646, 674, 11 L. Ed. 1141, 1153, viz.:

"The law has thus impressed upon it all the qualities and characteristics of property for the specified period, and has enabled him to hold and deal with it the same as in the case of any other description of property belonging to him, and on his death it passes, with his personal estate, to his legal representatives, and becomes part of the assets."

And also the language of Mr. Chief Justice Marshall in Grant v. Raymond, 6 Pet. 218, 241, 8 L. Ed. 376, 384, viz.:

"To promote the progress of useful arts is the interest and policy of every enlightened government. It entered into the views of the framers of our Constitution, and the power 'to promote the progress of science and useful arts, by securing for limited times to authors and inventors, the exclusive right to their respective writings and discoveries,' is among those expressly given to Congress."

The court, in Bement v. National Harrow Co., at page 90 of 186 U. S., page 755 of 22 Sup. Ct. (46 L. Ed. 1058), also says:

"In Heaton-Peninsular Company v. Eureka Specialty Company, 47 U. S. App. 146, 160 [77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728], it is stated regarding a patentee: 'If he see fit, he may reserve to himself the exclusive use of his invention or discovery. If he will neither use his device nor permit others to use it, he has but suppressed his own. That the grant is made upon the reasonable expectation that he will either put his invention to practical use, or permit others to avail themselves of it upon reasonable terms, is doubtless true. This expectation is based alone upon the supposition that the patentee's interest will induce him to use, or let others use, his invention. The public has retained no other security to enforce such expectations. A suppression can endure but for the life of the patent, and the disclosure he has made will enable all to enjoy the fruit of his genius. His title is exclusive, and so clearly within the constitutional provisions in respect of private property that he is neither bound to use his discovery himself nor permit others to use it. The dictum found in Hoe v. Knap [C. C.] 17 Fed. 204, is not supported by reason or authority.'"

The next proposition is that the owers of the patent may wholly control not only the making and selling of the machine, made under and in accordance with the patent, but the use of same by others, provided that the conditions or limitations or restrictions imposed are not in their very nature illegal under the provisions of some national law, or illegal and in violation of some law duly enacted by a state in the exercise of its police power; as to which last proposition, see Missouri, etc., v. Bell Telephone Co. (C. C.) 23 Fed. 539; State ex rel., etc., v. Del., etc., Co. (C. C.) 47 Fed. 633; and D. & A. Co. v. Delaware, etc., 50 Fed. 677, 2 C. C. A. 1, 3 U. S. App. 30. See, also, Button Fastener Case, 77 Fed. 292, 293, 25 C. C. A. 267, 35 L. R. A. 728. The main proposition just stated is settled and determined in Bement v. National Harrow Co., supra, as fully appears from the language quoted. It follows that the owner of the patent may sell a limited interest in the machine made by such owner, or limit the uses to which such machine may be put and provide that it shall not be used by the purchaser or licensee to manufacture certain specified articles or descriptions of goods. It is not probable, nor is it necessary to hold, that the owner of a patent can compel the owner (having a limited ownership) or licensee to use—that is, operate—a patented machine or article or device; but if the license is to use it in a particular way and for a particular purpose, or with particular and specified materials, and no other, and the limitations and conditions imposed violate no law and involve no such violation, it cannot be doubted that the licensee (or limited owner, if he be such) may be restrained or enjoined from using it in some other way, or for some other purpose, or with some other materials. It seems to this court that this doctrine is too firmly established to be seriously questioned. Indeed the right to enjoin and the necessity for enjoining a violation of such a restrictive agreement as to the use of the machine or device, or of the license, as that is the better term to describe the situation, would seem to be the necessary and the only adequate remedy if courts would maintain and enforce the rights of ownership possessed by the patentee or his assignee as by the decisions of the Supreme Court they are declared to be. Heaton-Peninsular Button Fastener Co. v. Eureka Specialty Co. et al., 77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728; Tubular Rivet & Stud Co. v. O'Brien et al. (C. C.) 93 Fed. 200; Cortelyou v. Lowe, 111 Fed. 1005, 49 C. C. A. 671; Brodrick Copygraph Co. of New Jersey et al. v. Roper (C. C.) 124 Fed. 1019.

The Button Fastener Case, supra, has been frequently cited and approved in more than one circuit. It was cited in Cortelyou et al. v. Lowe, supra (Second Circuit C. C. A.), and of it the court, per curiam, said:

"This cause comes here on appeal from an order granting preliminary injunction. The case upon which the order was granted is in its facts practically identical with the one which was before the Circuit Court of Appeals of the Sixth Circuit in Heaton-Peninsular Button Fastener Co. v. Eureka Specialty Co., 25 C. C. A. 267, 77 Fed. 288, 35 L. R. A. 728. We fully agree with the opinion of the court in that case, and think the decision should control the case at bar."

It is followed and approved in Tubular R. & S. Co. v. O'Brien, supra (Lowell, D. J.), and in Brodrick C. Co. of N. J. et al. v. Roper, supra (Brown, D. J.), and seems to be recognized as the law of the First Circuit.

In Heaton-Peninsular Button Fastener Co. v. Eureka Specialty Co., supra, which must be accepted as correctly declaring the law for the Second Circuit, the syllabus is as follows:

"1. Patents—Conditional Sale of Patented Machines—Public Policy—Infringement. It is competent for the owner of a patent for a machine for fastening buttons to shoes with metallic fasteners to sell such machines subject to a condition that they shall be used only with fasteners manufactured by the seller, title to revert on breach of the condition. Even though the fasteners are not patented, and the result of the restriction is to give the owners of the machine patent a monopoly of their manufacture and sale, this does not make the condition void as in restraint of trade or against public policy. A purchaser of the machine would be, in effect, a mere licensee, and the use of it by him contrary to the condition would be, not only a breach of contract, but a violation of the monopoly, for which an injunction suit would lie. [C. C.] 65 Fed. 619, reversed. State of Missouri v. Bell Tel. Co. [C. C.] 23 Fed. 539; State v. Delaware & A. Tel. & Tel. Co. [C. C.] 47 Fed. 633; Id., 2 C. C. A. 1, 50 Fed. 677—distinguished.

"2. Same—Notice of Condition. In such case it is immaterial that the patent owner sells the machines through jobbers, and not directly to users, where the machines each bear a conspicuous metal label with the condition of the sale inscribed thereon, and both the jobbers and their vendees have notice thereof.

"3. Same—Contributory Infringement. Where machines for fastening on buttons are sold by the patentee upon the condition that only the staples manufactured by such patentee (which are not patented) shall be used therein, the manufacture and sale by another party, to the users of such machines, of staples which are intended to and can only be used therein, is a contributory infringement, and will be enjoined. [C. C.] 65 Fed. 619, reversed. Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co., 14 Sup. Ct. 627, 152 U. S. 425 [38 L. Ed. 500], distinguished."

In that case the questions involved here are exhaustively and intelligently discussed.

In Tubular Rivet & Stud Co. v. O'Brien, supra, the syllabus is as follows:

"1. Patents—Infringement—Violation of License. Where the owner of a patent on a machine for setting lacing studs licenses the use thereof on condition that the licensee shall only use studs manufactured by the licensor, such studs not being patented, it is an infringement for the licensee to use the machine for setting studs obtained from others in violation of the license.

"2. Same—Contributory Infringement. In such case, a third person who sells to the licensee studs of his own manufacture, knowing that they are to be used in the patented machine in violation of the terms of the license, and intending that they shall be so used, is guilty of contributory infringement, and will be enjoined."

When the maker and vender of the rotary neostyle parted with it, with the license restriction thereon, conspicuously made a part thereof, it was notice of the restriction; notice that a license only was being granted; a limited and restricted ownership or interest in the patented machine only was being conferred.

In the Button Fastener Case, supra, at page 290 of 77 Fed., page 269 of 25 C. C. A. (35 L. R. A. 728), it is said:

"In view of the conspicuous character of both the machine and the notice permanently affixed thereon, every one buying must be conclusively presumed

to have notice that the owners of the patents intended by the inscription on the machine to grant only a restricted license for its use, and it is difficult to see why such purchaser is not to be regarded as acquiring and accepting the structure subject to this restriction. The buyer of the machine undoubtedly obtains the title to the materials embodying the invention, subject to a reverter in case of violation of the conditions of the sale. But, as to the right to use the invention, he is obviously a mere licensee, having no interest in the monopoly granted by the letters patent. A license operates only as a waiver of the monopoly as to the licensee, 'and estops the licensor from exercising its prohibitory powers in derogation of the privileges conferred by him upon the licensee.' Rob. Pat. §§ 806–808. It has been said that the sole matter conveyed in a license is the right not to be sued. Hawks v. Swett, 4 Hun, 146. A licensee is one who is not the owner of an interest in the patent, but who has, by contract, acquired a right to make or use or sell machines embodying the invention. Gayler v. Wilder, 10 How. 477 [13 L. Ed. 504]; Oliver v. Chemical Works, 109 U. S. 75, 3 Sup. Ct. 61 [27 L. Ed. 862]; Rob. Pat. §§ 606–608. All alienations of a mere right to use the invention operate only as licenses. It must follow, therefore, that the purchaser of one of complainant's machines subject to a restricted use takes the structure with a license to use the invention only with staples made by the patentee. That the complainant sells the machine through jobbers, and not directly to those who buy for use, is immaterial, under the facts stated on the face of the bill. The jobber buys and sells subject to the restriction, and both have notice of the conditional character of the sale and of the restriction on the use. Supply Co. v. Bullard, 17 Blatchf. 160, Fed. Cas. No. 294; Cotton Tie Co. v. Simmons, 106 U. S. 89, 1 Sup. Ct. 52 [27 L. Ed. 79]. That the buyer enters into an implied agreement that he will not use the machine contrary to the terms of his license, and that there is in the agreement a provision for a reverter of the title to the structure, may operate to give the patentee a remedy under general principles of law, as for damages for a breach of contract, or for recovery of the machine. It may be that a suit for a breach of contract would not be a suit depending on the patent laws, and would therefore be cognizable by the state courts, as intimated in Hartell v. Tilghman, 99 U. S. 547 [25 L. Ed. 357], and White v. Rankin, 144 U. S. 628, 12 Sup. Ct. 768 [36 L. Ed. 569]. The remedy of complainant may be a double one; for liability may rest either upon the broken contract, or for the tortious use of the invention. Rob. Pat. §§ 1225–1250, and notes. If a patentee may lawfully make and sell machines embodying his invention, and restrict the use of the invention in respect of territory, or time or business, or purposes to which it may be put, or material to be used in conjunction therewith, it would seem very obvious that the effect of the restrictions and limitations on the use would operate to prevent the machine from passing, as in the case of an unconditional sale, beyond the monopoly of the patent. The control reserved by the patentee as to the use of the machine has the effect of continuing it within the prohibition of the monopoly. The license defines the boundaries of a lawful use, and estops the licensor from the assertion of his monopoly contrary to its terms. On the other hand, a use prohibited by the license is a use in defiance of the monopoly reserved by the patentee, and necessarily an unlawful invasion of the rights secured to him by his patent. The license would be no defense to a suit for infringement by a use in excess of its terms. The patentee has the exclusive right of use, except in so far as he has parted with it by his license. The essence of the monopoly conferred by the grant of letters patent is the exclusive right to use the invention or discovery described in the patent. This exclusive right of use is a true and absolute monopoly, and is granted in derogation of the common right, and this right to monopolize the use of the invention or discovery is the substantial property right conferred by law, and which the public is under obligation to respect and protect."

In the case at bar, the complainants having expended time, skill, and money to make this rotary neostyle a success, and being the owner of the patent under which it was made and of the machine when made, they were at perfect liberty, so long as they violated

no positive law, to place it in the hands of users or others, under such conditions, limitations, and restrictions as they saw fit to impose. They had the right to impose such conditions, restrictions, and limitations as in their judgment would secure the commercial success of the machine. To secure such success, it was necessary to provide supplies, such as ink, etc., of a particular kind and quality. This they did, and they stood ready to furnish these supplies. The person taking it received it, and, if he used it, used it subject to these conditions and limitations, and was bound to observe them. He agreed to use these supplies and no other on this machine, and he was bound to observe his agreement. If it is contended that there was no written contract with the restrictive license agreement contained therein, the answer is that nothing of the kind was necessary. The machine could be seen, was seen, and the notice was a conspicuous part thereof, would have been seen, must have been seen, had the person receiving it looked. He was bound to look. If he did not, or was prevented by accident or any act of the complainants from seeing the machine, it was his duty to return it on discovering the agreement attached thereto.

The purchaser of personal property, with certain exceptions, such as articles for food, etc., takes it subject to all defects plainly observable. He is bound to look, to exercise his senses. The seller has the right to believe he will look and exercise his senses, and that he has when he accepts the property. Not so, however, as to hidden defects known to the seller, and not so when the seller misleads or so distracts the attention of the purchaser as to prevent his seeing. In putting these machines upon the market, the complainants have made the license agreement as conspicuous as the machine itself. The label itself is white, with black letters; the machine black. There was no fraud or deceit. The takers and users of the machines were and are bound by the license restriction placed thereon. A patent may be infringed in either of three ways; by the unlawful making, or by the unlawful selling, or by the unlawful using of a patented invention. This is elementary. 3 Robinson on Patents, § 890; Goodyear Shoe Machinery Co. v. Jackson, 112 Fed. 148, 50 C. C. A. 159, 55 L. R. A. 692. If, then, the owner of the patent has given to another the right to use one of the machines made under the patent in a particular way only, or with supplies necessary to its use of a particular character or make only, the use of it in any other way, or with any other supplies or materials necessary to its operation, is necessarily a violation of the agreement, limitation, or license, and therefore unlawful. The word "unlawful" in this connection does not imply a criminal use of the machine or device, but a violation of the contract or agreement under which same is held and used. It follows that, by knowingly using a rotary neostyle made under this patent in question with ink other than that made and furnished by the Neostyle Company, the user violates the agreement and becomes a wrongdoer, and is "unlawfully using" the patented invention, and is therefore an infringer of the patent. It is not a breach of contract simply, but an unlawful and an unauthorized use of the patented

invention. The cases cited, especially the Button Fastener Case (77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728), fully sustain these statements. See, also, 2 Robinson on Patents, § 812, where it is said:

"In the absence of express restrictions in the license, this right of use is unlimited as to place, quantity, and method, and may be continued during the term for which the patent has been granted, although the use must be confined to the precise invention covered by the patent of the licensor. Express restrictions as to place, time, quantity, or mode of use are binding on the licensee, and render all use contrary to such restrictions an infringement of the patent. A license to use within a certain district only, or at a certain shop, or on a certain line of railway, gives no authority to the licensee or his vendees to employ the invention in another district, or at a different shop, or on a new or an extended line of railway. A license to use a specified number of the patented articles, or to use the patented process for the production of a certain quantity of its results, does not empower the licensee to use a greater number or produce a greater quantity, even though he is willing to pay the licensor additional royalties or license fees in proportion to the increase of his use of the invention. A license to use for a given purpose only, or in a particular manner, or for a period less than the duration of the patent, binds the licensee with equal strictness, and makes him liable as an infringer for any excess of use beyond what is distinctly conferred upon him."

We are thus brought to the question of contributory infringement. It would seem clear that "contributory infringement" ought to include and does include more than "the intentional aiding of one person by another in the unlawful making or selling or using of the patented invention." In Goodyear Shoe Machinery Co. v. Jackson et al., 112 Fed. 146–148, 50 C. C. A. 159, 55 L. R. A. 692, this is the definition given. It is also stated, "The essence of contributory infringement lies in concerting or planning with others in an unlawful invasion of the patentee's rights." The syllabus reads:

"1. Patents—Contributory Infringement. The essence of contributory infringement of a patent lies in concerting or planning with others in an unlawful invasion of the patentee's rights, which is usually done by making or selling a part of the patented invention with the intent and purpose of aiding another in its sale or use. Contributory infringement cannot be predicated of the rebuilding or replacing of parts of a patented machine by a purchaser for his own use."

See, also, Thomson-Houston Electric Co. v. Kelsey Electric R. S. Co. (C. C.) 72 Fed. 1016, 1017.

If A., for his own gain or emolument or advantage, or for the gain or advantage of some other person, induces B., licensee of a valid patent, to violate the terms of the license and use the patented device in a manner or for a purpose that makes B. an infringer, he should be held guilty of contributory infringement. In such case A. does not aid the infringer in doing the wrongful act (in the strict sense), but he does induce him to commit it. But it is not necessary to go beyond the decided cases in determining the question now before the court.

In Thomson-Houston Electric Co. v. Kelsey Electric Railway Specialty Co. et al., 75 Fed. 1005, 22 C. C. A. 1, the court held:

"1. Patents—Contributory Infringement. An injunction on the ground of contributory infringement may be granted against one who, by his advertise-

ments and course of business, shows a willingness to co-operate with any infringer who may present himself, by making and selling to him a device or element of a patented combination, to be used in connection with other parts obtained from a different source. Wallace, Circuit Judge, dissenting."

In Tubular Rivet & Stud Co. v. O'Brien (C. C.) 93 Fed. 200, the complainant was the owner of patents for setting lacing studs, which patents were embodied in machines made by it. These machines were licensed by the complainant by a written lease, which provided that the licensees should use in the machines only those studs manufactured by the complainant, and that upon a violation of any of the conditions of the lease the right to the further use of the machine by the licensees should be forfeited, and the complainant might take possession thereof. The defendant was selling and offering for sale to those licensees studs of their own manufacture, knowing that same were to be used in the licensed machines and in violation of the provisions of the lease, and intended that the studs should be so used. It was alleged, and for the purposes of the case was conceded, that the defendant had induced and persuaded, and was inducing and persuading, the licensees to violate the lease and infringe the patent. It was held that this constituted contributory infringement, and the acts alleged were enjoined. The syllabus of the case has been quoted already.

In Heaton-Peninsular Button Fastener Co. v. Eureka Specialty Co. et al., 77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728, the syllabus of which has been quoted already, there was no written lease. The machines were sold on condition, which condition was attached to the machine substantially in the same manner as is the condition attached to the rotary neostyle in the case at bar. That case was decided on a demurrer to the bill, and the allegation was that no machines had ever been sold except upon condition, and that there was attached to each machine a conspicuous metal plate on which was plainly expressed a restriction upon the use of the machine, to the effect that the machine was sold and purchased "to use only with fasteners" made by the complainant, or the Peninsular Novelty Company, predecessors in title to the patents embodied in the machine, and that title should revert at once upon any violation of this restriction. It was alleged that the users had full notice of such restriction and purchased the same subject thereto. It was further alleged that the defendants in that case, with full knowledge of the restriction, were making and selling staples adapted only to use with those machines, and that they were guilty of contributory infringement, because such staples so made and sold by them were adapted for use in those machines only, and were made and sold with intent that they should be used in violation of the restriction placed upon the use of the machines aforesaid. It was further alleged that the defendants had persuaded and induced the licensees of said machines to purchase and use the staples made by the defendants on such machines, and to thus knowingly and continuously violate the restriction. It was charged that the defendants were guilty of contributory infringement because they induced others to use the machine in excess of the license and fur-

nished the means to enable the licensees to so wrongfully use the machines.

It will be noted that in the case last mentioned there was no lease, and that the restriction placed upon the use of the machine was in substance and effect the same as employed by the complainant in the case now before the court. In that case there was a provision that title to the machine should revert to the seller on a violation of the restriction. The court held, however, that title to the machine did not pass, and that the person taking and using the machine with that limitation thereon held, not as owner, but as licensee. What the court said in that case on that subject has been quoted already. In the judgment of this court it is entirely immaterial that there was not a written lease or a provision that title should revert in case of a violation of the license condition attached to the machine. The restrictive agreement in the case now before the court was upon the machine, and must have been seen and read by the licensee, and, as he kept the machine, it imposed the obligation upon him to comply with the condition, and by not returning it he assented to such condition and limitation, and became bound thereby.

In Cortelyou v. Lowe, 111 Fed. 1005, 49 C. C. A. 671, and Brodrick Copygraph Co. of N. J. et al. v. Roper (C. C.) 124 Fed. 1019, while the facts are not stated, it is understood by the court, and was conceded in substance, that the facts were substantially the same as in the case now before the court. Those cases were decided on motions for preliminary injunction. This case, on substantially the same facts and involving the same legal questions, is being heard upon the merits.

In this case it is satisfactorily established by the evidence that the defendant not only supplies the ink for use upon the rotary neostyle made and sold by the complainants under the license agreement before mentioned, which ink is used by the licensees in infringing the patent by violating such agreement, but induces and procures such infringement—that is, the use of such ink by such licensees—by means of misstatements and misrepresentations as to the character and legal effect of the authority conferred upon the licensee. It appears that the attention of the complainants was brought to the fact that one of the rotary neostyles disposed of by it under such license agreement was not turning out satisfactory work. A representative of the Neostyle Company examined into the matter, and found that the licensee had and was using ink, made by and bearing the defendant's label, similar to the ink made by the Neostyle Company. This ink made by the defendant and sold by it was put up in one-pound cans, and bore the inscription "Rotary Neostyle." It further appears that the licensee had ordered ink made by the Neostyle Company, but the order had been filled with ink made by the defendant. It appears that the representative of the defendant was making efforts to sell defendant's ink for use upon the rotary neostyle made and licensed by the complainants' company, and this agent or representative of the defendant insisted that it was all right to use upon that machine the ink made by the defendant, notwithstanding the license restrictions on

the machine. Even were it true that in this particular instance, to which attention has just been called, the licensee did not intend to violate the license agreement and violated same unknowingly, such fact does not relieve such licensee from the charge of infringement. In fact, such licensee was infringing. In fact, it was violating the license agreement. Here was infringement, and the defendant is guilty of contributory infringement, because it knowingly, intentionally, and willfully induced the licensee to use ink made by it, the defendant, instead of ink made by the complainant company. And the defendant did this with knowledge of the license restriction. Some of these facts are inferred, and must be inferred, from other facts clearly proved by positive testimony. In fact, the defendant has not only knowingly and willfully and intentionally, for its own gain and profit, induced the licensee to violate the license agreement and thus infringe, but it has palmed off upon such licensee goods of its own manufacture and production in place of goods made by the complainant company. It would appear from the evidence that the defendant is not only guilty of contributory infringement, but of unfair competition in trade. Such methods ought not to be sanctioned. Such acts ought to be enjoined. The defendant company claims, in substance, that it did not know what the words "Rotary Neostyle" meant. Defendant company insists it did not know the rotary neostyle was patented and placed in the hands of users under the agreement mentioned. Under all the proof in the case, this court cannot assent to this proposition. It is evident that the defendant knew of the rotary neostyle, knew the rights of its makers and sellers, knew of its great utility, and, from all the proof, the court is satisfied it knew it was a patented machine or device. The defendant made its ink for and labeled it as ink for a rotary neostyle. Upon the ink made and sold by the complainant company was the following notice, viz.:

"Notice to rotary neostyle users. The rotary neostyle is sold with a proper license restriction governing the use of stencil paper, ink and other supplies, and is so marked, thus insuring to the purchaser absolute protection against infringing and spurious imitations which may be offered. The sole legal right to make and sell supplies for use on said rotary neostyle is vested in us, and care should be taken to see that said supplies when purchased are plainly marked with our name as makers. Neostyle Company, New York City, U. S. A., 30 Reade Street."

This court finds that the defendant had actual notice or is chargeable with notice of the license agreement, and furnished ink of its manufacture to one or more of the licensees of the complainants with knowledge of such license agreement, and intending to induce such licensee or licensees to violate the same, and that the acts of the defendant in this regard were for its own pecuniary benefit.

On the subject of what constitutes contributory infringement, attention is called to a note to Edison Electric L. Co. v. Peninsular Light, P. & H. Co., 101 Fed. 831, 43 C. C. A. 485, 489.

The defendant has the right to make ink and to sell ink, and to make and sell the same kind of ink it sold or caused to be sold to the licensee or licensees of the complainants, but it has no right,

directly or indirectly, to dispose of same with intent or purpose that it shall reach the hands of the users of the rotary neostyle. See Bullock Electric & Mfg. Co. v. Westinghouse Electric & Mfg. Co., 129 Fed. 105, 63 C. C. A. 607.

In Loew Filter Co. et al. v. German-American Filter Co. of New York, 107 Fed. 949, 47 C. C. A. 94, it was held that:

"One who manufactures and sells an article adapted to and intended for no other use than that of practicing a patented process contributes to the infringement by the users, and stands on the same ground as to liability."

The proof in the case now before the court does not show that the ink made by the defendant is only adapted to and intended for use upon the rotary neostyles. For aught that appears, it may be used for other purposes and in other places. This court cannot enjoin the defendant from making and selling its ink, but it can enjoin, and ought to enjoin, the defendant from infringing or procuring the infringement of the Lowe patent in question here by procuring licensees thereunder to violate the conditions imposed by the license agreement attached to the patented machines. The injunction should run against the doing of this or the commission of any acts that would procure such a violation.

The court has given careful attention to Morgan Envelope Co. v. Albany Perforated Wrapping Paper Company, 152 U. S. 425, 14 Sup. Ct. 627, 38 L. Ed. 500, and finds nothing therein in any way inconsistent with the conclusions here reached.

The complainants are entitled to a decree for an injunction as prayed and for an accounting. The decree, if not agreed upon, may be settled before me at Binghamton, N. Y., June 13, 1905.