STATE *ex. rel.* POSTAL TELEGRAPH CABLE CO. *v.* DELAWARE & A. TELEGRAPH & TELEPHONE CO.

*(Circuit Court, D. Delaware. July, 1891.)*

1. TELEPHONE COMPANIES—DUTY TO FURNISH SERVICE.

The respondent, a telephone company, maintaining the only telephone exchange in a city which was connected with telephones in the places of business and residences of its subscribers, refused, on demand, to furnish telephone instruments to relator, a telegraph company, which was operating a telegraph line within the same territory, as part of a large system, except on condition that the instruments should not be used as an adjunct to the receiving and transmitting of telegraphic messages, although respondent had furnished such telephonic facilities to another telegraph company, a competitor with relator in the same city, without such condition. *Held*, that respondent was a common carrier, offering to the public the use of its telephonic system for the rapid conveyance of oral messages, and, as such, was subject to the duty of serving all persons alike, impartially, and without unreasonable discrimination; and that the right to equal facilities for the use of such public system extended to telegraph companies as well as to individuals.

2. SAME—CONTRACT RESTRICTING USE OF PATENTED DEVICE.

Respondent alleged that it was a mere licensee of the owner of patents for the telephones; that it was forbidden by the terms of its license to supply a telephone instrument to any telegraph company, to be used for telegraphic purposes, without the consent of its licensor; and that it had furnished a telephone to such other telegraph company under a general order from the owner of the patents, in pursuance of a contract between such owner and such telegraph company for an exclusive license to the latter for a term of years to use the telephone in receiving and transmitting messages. *Held*, that this was no justification for the refusal to comply with the demand of relator, such contract being void as against public policy. The patented device having been employed for a public use, by a common carrier, in the prosecution of its business, relator was entitled to use it on the same terms as others in the same class.

Petition for *Mandamus*.

*George H. Bates* and *R. S. Guernsey*, for relator.

*Edward G. Bradford* and *Charles L. Buckingham*, for respondent.

WALES, **J.** This is an application for a writ of *mandamus* to compel the respondent to place a telephone transmitter and receiver in the office of the relator on the same terms as are given to other subscribers. The relator's petition was originally filed in the superior court of the state of Delaware, for New Castle county, and has been brought here by an order of removal made by that court, at the instance of the respondent, on the ground that the question for decision, being how far a patentee is entitled to control the use of his patent, was one which should be determined under the constitution and laws of the United States. *Water Co. v. Keyes*, 96 U. S. 199; *Carson v. Dunham*, 121 U. S. 421, 7 Sup. Ct. Rep. 1030. Each of these parties is a corporation created by the laws of the state of New York, is transacting its business and has its principal offices in the city of Wilmington and district of Delaware. The relator is operating a telegraph line through this district, which is part of a large system connecting the business centers of the several states, and also by ocean cable with the principal cities of Europe. The respondent is maintaining the only telephone exchange in the city of Wilmington which is connected with telephones in the offices, places of business, and residences of its subscribers. The demand of the relator to be furnished with a telephone was refused, except on condition that the instrument should not be used as an adjunct to the telegraph business in the receiving and transmitting of telegraphic messages, although the respondent has furnished telephonic facilities to the Western Union Telegraph Company, which is a rival of, and a competitor with, the relator in the same city, without any such condition. In justification of its refusal to comply with the relator's demand, the respondent, in its answer, sets out at length certain facts which, so far as they show the nature and character of the defense, may be stated in a very few words. On the 10th of November, 1879, the Western Union Telegraph Company and the National Bell Telephone Company, having been up to that time the owners of rival telephone patents, and engaged in litigation concerning them, compromised their differences by a contract by virtue of which the National Bell Telephone Company became the owner of all the telephone patents which had been in dispute, and the ownership of which now constitutes the telephone monopoly. One of the conditions of the compromise was that the Western Union Telegraph Company should have a sole and exclusive license for the term of 17 years to use the telephone in the receiving and transmitting of telegraphic messages. These patents have since been assigned to the American Bell Telephone Company, but the exclusive privilege conferred on the Western Union Telegraph Company by the contract of November 10th has been continued in every subsequent contract between the owners of the telephone patents and their licensees. The respondent is a mere licensee and is forbidden, by the terms of its license, to supply a telephone instrument to any telegraph company, to be used for telegraphic purposes, without the consent of its licensor, and it has furnished the Western Union Telegraph Company with a telephone under a general order from the owners of the telephone patents.

The patent laws secure to a patentee very valuable rights as a reward for his invention, and also as an incentive to others to exercise their inventive faculties. He may dispose of his patented property or discovery in several different ways, and for distinct purposes and uses, and the law of congress will protect him in the enjoyment of his rights, and save him from competition, during the life of his patent. At the same time, while he is thus favored, neither he nor his patented product is exempted from the liabilities and regulations which attach to all other persons and property under the general law of the land. An illustration of this qualified right of a patentee may be found in *Patterson* v. *Kentucky*, 97 U. S. 501. In that case the appellant had been convicted in a state court of selling an improved burning oil, of which he was the inventor, and which had been condemned by the state inspector as unsafe, but which the appellant claimed he had the right to sell by virtue of letters patent issued to him by the United States. The supreme court, speaking through Mr. Justice HARLAN, said:

"The right which the patentee or his assignee possesses in the property created by the application of a patented discovery must be enjoyed subject to the complete and salutary power, with which the states have never parted, of so defining and regulating the sale and use of property within their respective limits as to afford protection to the many against the injurious conduct of the few."

The same doctrine was held in *Jordan* v. *Overseers*, 4 Ohio, 295, where the court said:

"A patentee has the power to manage his property, or give direction to his labors, at his pleasure; subject only to the paramount claims of society, which require that his enjoyment may be modified by the exigencies of the community to which he belongs, and regulated by laws which render it subservient to the general welfare."

In each of these cases the patentee had attempted to sell his patented articles without regard to the provisions of the state statutes. It was decided that he could not do so, for the reason that, while a state law could not interfere with the right of a patentee in the possession of his monopoly, it could control and regulate the application and use that might be made of the monopoly, and that in his management he was subject to the same responsibilities which are imposed on the owners of other kinds of property. In *Vannini* v. *Paine*, 1 Har. (Del.) 65, the facts were these: Yates and McIntyre were the assignees of Vanini, the inventor and patentee of a mode of drawing lotteries on the commutation and permutation principle, and were engaged in the business of drawing lotteries in Delaware. The defendants, who were also lottery brokers, had iss  d a scheme for drawing a lottery on the plan of Vanini's patent. The complainants filed a bill for injunction, partly on the ground that the defendants were infringing the patent rights of Vanini. The chancellor had dismissed the bill for other reasons, and the court of errors and appeals of Delaware, in affirming the decree, incidentally referred to the claim made under the patent, and said:

"At the time Yates and McIntyre made contracts for the lottery privileges set forth in their bill, we had in force an act of assembly prohibiting lotteries,

the preamble of which declares that they are pernicious, and destructive to frugality and industry, and introductive of idleness and immorality, and against the common good and general welfare. It cannot, therefore, be admitted that the plaintiffs have a right to use an invention for drawing lotteries in this state merely because they have a patent for it under the United States. A person might, with as much propriety, claim a right to commit murder with an instrument because he had a patent for it as a new and useful invention."

The conclusion drawn from an examination of these cases is that the patent laws give to the patentee a monopoly in his invention, and afford him protection in its proper and legitimate employment; but that they do not authorize him to employ it for a purpose or in a manner that may be forbidden to all other persons in the use of their unpatented property or discoveries. Since the above decisions were made, the telephone patents have come into general use, and the telephone, as an instrument for the rapid transmission and reception of messages, has been adopted by all classes of persons, in almost every department of business, public and private, and is now, within the scope of its power, as essential to the convenience and welfare of the public as are the railroad and the telegraph. The beginning, progress, and completion of business transactions, involving large interests, depend upon the certainty of telephonic communication, which has been accessible to the public for such a length of time that any course of action by the owners of the telephone patents which might prevent or limit the general use of the telephone would produce the most serious consequences. Up to the present time, the telephonic system has been, and continues to be, open to all persons and corporations, excepting telegraph companies, and the question now before the court is, has the respondent a right to exclude the latter; and the solution of this question depends upon another one,—whether the telephone company has, intentionally or unintentionally, assumed the character, functions, and duties of a common carrier, and thus made itself subject to the same principles and rules of law applicable to all other common carriers, the chief one of which is that they must serve the public impartially, and without unjust discrimination, to the utmost of their ability. That such duty is incumbent on every common carrier is elementary law, and will be admitted without discussion. It had its foundation in public right which is superior to private interest. It has been said that a man is not compelled to put his property to public use, but that, when he does, the manner of its use may be controlled and regulated by law. Familiar examples of this proposition may be found in municipal ordinances and legislative enactments relating to hackney coaches, taverns, warehouses, ferries, etc.; and the doctrine has been fully considered and established by the supreme court of the United States in *Munn* v. *Illinois*, 94 U. S. 113. The controversy in that case originated in a statute of the state of Illinois, which provided a maximum charge for the storage and handling of grain in warehouses and elevators appropriated to those uses in Chicago and other places in the state having not less than 100,000 inhabitants. Munn and Scott, the defendants below, being the owners of grain warehouses and elevators at Chi-

cago, had violated the statute by neglecting to take out a license, and by charging more than the maximum rates, and, on conviction of such violation in the court below, took a writ of error to the supreme court, on the ground, among others, that the statute was repugnant to that part of the first section of article 14 of the amendment to the constitution of the United States which ordains that no state shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws. In answer to this, the counsel for the state contended that warehouses for the storage of grain, in the manner the business was conducted in Chicago, were engaged in a public employment, as distinguished from ordinary business pursuits, and in this regard they occupied a position similar to common carriers, who are held to "exercise a sort of public office," and have public duties to perform Chief Justice WAITE, in delivering the opinion of the court, said:

"Looking, then, to the common law, from whence came the right which the constitution protects, we find that, when private property is affected with a public interest, it ceases to be *juris privati* only. This was said by Lord Chief Justice HALE more than two hundred years ago in his treatise *De Portibus Maris*, (1 Harg. Law Tracts, 78,) and has been accepted without objection as an essential element in the law of property ever since. Property does become clothed with a public interest when used in a manner to make it of public convenience, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public, for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use, but, so long as he maintains the use, he must submit to the control. * * * So, if one owns the soil and landing-places on both sides of a stream, he cannot use them for the purposes of a public ferry, except upon such terms and conditions as the body politic may from time to time impose; and this because the common good requires that all public ways shall be under the control of public authorities."

After alluding to the fact that the vast grain productions of seven or eight great states of the west, and their transportation to the east, passed through and paid toll to the Chicago elevators, the opinion concludes the discussion of this point by saying:

"Under such circumstances, it is difficult to see why, if the common carrier, or the miller, or the ferryman, or the innkeeper, or the wharfinger, or the baker, or the cartman, or the hackney coachman pursues a public employment, and exercises a sort of public office, these plaintiffs in error do not. They stand, to use again the language of their counsel, in the very gateway of commerce, and take toll from all who pass. Their business most certainly tends to a common charge, and has become a thing of public interest and use. Every bushel of grain for its passage pays a toll, which is a common charge, and therefore, according to Lord HALE, every such warehouseman ought to be under public regulation, viz., that he take but reasonable toll. Certainly, if any business can be clothed with a public interest, and cease to be *juris privati* only, this has been."

The opinion of the court in the case of *Munn* v. *Illinois* shows how private property may become dedicated *sub modo* to public use, and thus

be brought under public control; and it also decides that the limitation, by legislative enactment, of the rate of charge for services rendered in a public employment, or for the use of property in which the public has an interest, established no new principle in the law, but only gave a new effect to an old one. The power of the legislature to regulate these rates may be abused, and so may its power to tax; but these are questions of expediency, to be determined ultimately by the people, who are the source of legislative authority ultimately. The law as announced in *Munn* v. *Illinois* was afterwards applied to a telephone company, in *Hockett* v. *State*, 105 Ind. 250, 5 N. E. Rep. 178, in which the supreme court of Indiana upheld a statute of that state limiting the rent to be charged for the use of a telephone to a sum not exceeding three dollars per month. The court decided that a telephone company was a common carrier in the same sense as a telegraph company, its instruments and appliances being devoted to a public use, so that the legislature of a state could prescribe the maxmium charges for its services. This case was approved and followed by the same court, in *Telephone Co.* v. *Bradbury*, 106 Ind. 1, 5 N. E. Rep. 721, in which the same questions were discussed by able and distinguished counsel, and fully considered by the court. See, also, *State* v. *Telephone Co.*, 17 Neb. 126, 22 N. W. Rep. 237; and *Telephone Co.* v. *Falley*, 118 Ind. 194, 19 N. E. Rep. 604. The authorities last cited had reference to the right of individuals to the use of the telephone as a public system, which was open to all persons; but the courts of this country, with perhaps a single exception, have extended the same right to telegraph companies, in every case in which the defenses now set up by the respondent were made and overruled. In *State* v. *Bell Tel. Co.*, 23 Fed. Rep. 539, (1885,) in the United States circuit court for the eastern district of Missouri, the question was "whether the court could compel the defendant, managing the telephonic business in the city of St. Louis, to establish communication with any other individual or company than that permitted by its license from the patentee;" and Circuit Judge BREWER, in answering the question, said:

"A telephone system is simply a system for the transmission of intelligence and news. It is, perhaps, in a limited sense, and yet in a strict sense, a common carrier. * * * The moment it establishes a telephonic system here it is bound to deal equally with all citizens in every department of business, and, the moment it opened its telephonic system to one telegraph company, that moment it put itself in a position where it was bound to open its system to any other telegraph company tendering equal pay for equal service."

In *Bell Tel. Co.* v. *Com.*, 3 Atl. Rep. 825, the supreme court of Pennsylvania, adopting the able opinion of Judge ARNOLD in the court below, decided that the telephone company was a common carrier. A like decision was rendered in *Chesapeake & Potomac Tel. Co.* v. *Baltimore & O. Tel. Co.*, 66 Md. 399, and in *Commercial Union Tel. Co.* v. *New England Telephone & Telegraph Co.*, (Vt.) 17 Atl. Rep. 1071. Being a common carrier, the telephone company has not the right to discriminate in granting licenses for the use of the telephone instruments. It has already been noticed that the Western Union Telegraph

Company is not the owner of any of the telephone patents, but only a licensee. Whatever claims that company had in the patents were transferred by it to the National Bell Telephone Company under the contract of November 10th, which provided that thereafter the telegraph company should have the exclusive use of the telephone for purposes of telegraphy. But the enforcement of this part of the contract would violate the rule that, when the use of a patented device is thrown open to the public, or to classes of the public, all are entitled to use it on the same terms as others in the same class; and, therefore, any contract or agreement which would effectually evade the rule must be declared void as being against public policy, both at common law and by statute.

The authorities referred to by the counsel for the respondent to support their theory, that a patentee can control the use of his patent, are specially applicable to patents and patented articles designed for private use. In the Vermont case, *supra*, (17 Atl. Rep. 1071,) the distinction between the law governing the private use of a patent and the law governing its public use is briefly but clearly stated, and it was there said:

"Patents are property, and the right to sell or lease them is subject to the same restrictions as other property. The patentee cannot lease them for any use that contravenes principles of public policy. If he leases them for a public rather than an individual use, he thereby gives the use to the whole public. In this case the American Bell Telephone Company might have licensed its patent to the defendant so the latter alone could have used it; but when it went beyond this, and licensed the defendant to use it for the public, it in fact licensed it for all who desired its use, and offered compliance with reasonable conditions."

That decision was rendered in 1889, and is the most recent one of the adjudications on the questions now under discussion which have been brought to our notice. The decisions of the courts in Pennsylvania, Maryland, and Indiana were made with reference to the statutes of those states which had been enacted for the regulation of telephone companies, limiting charges and prohibiting discriminations; but there is a concurrence of opinion in the conclusion that those companies are subject to the common-law rules which pertain to all common carriers. In Nebraska and Vermont, in the absence of any general statutes on the subject, the courts have held the same doctrine.

The final position taken on behalf of the respondent is that, under the decision of the supreme court of the United States, in the *Express Cases*, reported in 117 U. S. 1, 6 Sup. Ct. Rep. 542, 628, the contract of November 10, 1879, is valid, and should be sustained. Those cases grew out of the applications of several independent express companies to compel certain railroad companies to carry their express matter and express agents. The applications were granted by the court below, but, on appeal, the supreme court held that the railroad companies were not required, by usage or by the common law, to transport the traffic of independent express companies over their lines in the manner in which such traffic is usually carried and handled, and that the use of the lines might be given to one or more express companies, or withheld altogether. The evidence showed that the business between the railroad companies and

the express companies had always been the subject of special contracts, which regulated the rates to be charged, and contained stipulations for the termination of the contracts. It also appeared that, with very few exceptions, only one express company had been allowed by a railroad company to do business on its road at one time. Chief Justice WAITE, in delivering the opinion of the court, said:

"The reason is obvious why special contracts in reference to this business are necessary. The transportation is of a kind which must, if possible, be had for the most part on passenger trains. It requires not only speed, but reasonable certainty as to the quantity that will be carried at any one time. As the things carried are to be kept in the personal custody of the messenger or other employe of the express company, it is important that a certain amount of car space should be especially set apart for the business, and that this should, as far as practicable, be put in the exclusive possession of the express-man in charge. As the business to be done is express, it implies access to the train for loading at the latest, and for unloading at the earliest, convenient moment. All this is entirely inconsistent with the idea of an express business on passenger trains free to all express carriers. * * * The car space that can be given to the express business on a passenger train is, to a certain extent, limited; and, as has been seen, that which is allotted to a particular carrier must be, in a measure, under his exclusive control. * * * On important lines one company will at times fill all the space the railroad company can well allow for the business. If this space had to be divided among several companies, there might be occasions when the public would be put to inconvenience by delays which could otherwise be avoided."

The reasons assigned for the decision in the *Express Cases* do not apply, even remotely, to the right of telephone companies to make discriminations by special contract in the transmitting of messages. In the first place, the relator is not asking for any special accommodation or service from the respondent, but for such facilities only as are given by the latter to the general public and to the Western Union Telegraph Company. These facilities are now actually furnished to other common carriers of every kind excepting telegraph companies, and the respondent is requested to do nothing more for the relator than it does for all of its patrons and subscribers. For want of a sufficient rolling stock, a railroad company may be unable to accommodate more than one express company on a single train. A telephone company is not prevented by any deficiency of appliances or of instruments from giving the same service to all, and, finally, it is not claimed by the respondent that it cannot serve the relator in like manner as it does others without inconvenience or delay to the public.

From the foregoing review of the law, it follows that the respondent is a common carrier which has offered to the public the use of a telephonic system for the rapid conveyance of oral messages from one point to another; that one of the most important duties of a common carrier is that it shall serve all persons alike, impartially, and without unreasonable discrimination; and that the performance of this duty cannot be avoided by a special contract made between the respondent or its licensor and one or more persons for the exclusive use of the system, such contract being void as against public policy; and that a patented device or

devices, when employed for a public use, or by a common carrier in the prosecution of its business, will be subjected to the rules and regulations which govern unpatented property under the same circumstances. The reasons assigned by the respondent for its refusal to furnish the relator with a telephone are therefore insufficient, and it is ordered by the court that the writ of *mandamus* be awarded.