# THE STATE OF INDIANA, EX REL. GOODWINE, v. CADWALLADER.

[No. 21,139. Filed March 11, 1909. Rehearing denied October 5, 1909.]

1. APPEAL.—*Assignments of Errors.—Failure to Designate Court Committing Alleged Error.*—An assignment that "the court erred in sustaining appellee's demurrer to the third paragraph of the relator's complaint," without designating the court which committed the alleged error, is sufficient. p. 625.

2. APPEAL.—*Assignments of Errors.—Designating Wrong Court as the One Committing Error.*—Designating the wrong court, in the assignment of errors, as the one committing the error complained of, presents no question as to the alleged error. p. 626.

3. APPEAL.—*Transfer of Property Involved.—Mandamus.—Damages.—Parties.*—An appeal, in an action for mandamus and for damages by the owner of a telephone exchange against the owner of another, for his refusal to permit connection with his exchange, should not be dismissed because the plaintiff has sold his exchange. p. 626.

4. PLEADING.— *Complaint.—Contracts.—Written.—Oral.—Presumptions.*—A contract is presumed to be oral unless alleged to be in writing. p. 628.

5. PLEADING.— *Complaint.— Contracts.—Telephones.*—A "working" agreement between the owners of two telephone exchanges, alleged in the complaint, filed January 23, 1907, to have been in force for more than two years, will be presumed not to cover a special contract, made February 7, 1906, relating to telephone service to a certain city. p. 628.

6. CONTRACTS.— *Breach.— Specific Performance.— Telephones.*— A contract between two owners of separate telephone exchanges, whereby their respective patrons have the right to the servics of both exchanges, is subject to specific performance, if, as a matter of law, it cannot be abandoned by such contracting parties. p. 628.

7. CONTRACTS.—*Indefinite as to Time.—Discontinuance.—Damages.*—Ordinarily, contracts of indefinite duration may be discontinued at any time by either party, the only remedy, in case of a wrongful breach, being an action for damages. p. 628.

8. CARRIERS.—*Telephones.*—A telephone company is a common carrier of news. p. 629.

9. TELEGRAPHS AND TELEPHONES.—*Ownership.*—An individual may own and operate a public telephone (§5796 Burns 1908, Acts 1903,

State, ex rel., *v.* Cadwallader—172 Ind. 619.

p. 204) ; but he is subject to the same restrictions and duties as
a corporation engaged in a similar service. p. 629.

10. TELEGRAPHS AND TELEPHONES.—*Use of Other Exchanges.*—The
owner of a telephone exchange is under no public duty requiring
him to furnish the use of his exchange or lines to the patrons of
another exchange, and all of such patrons must take notice
thereof. p. 629.

11. TELEGRAPHS AND TELEPHONES.—*Public Interest.*—*Discrimina-
tions.*—Property used in the telephone business for public pur-
poses is impressed with a public interest, and discrimination in
the use thereof is not permissible. pp. 630, 635, 637.

12. TELEGRAPHS AND TELEPHONES.—*Public Service.*—*Discrimina-
tions.*—The owner of a public telephone owes an impartial duty
to all persons, but in determining the scope of his duty to the
public generally, consideration must be given to the capacity of
his system and to his subscribers. p. 630.

13. TELEGRAPHS AND TELEPHONES.—*Exchanges.*—*Right to Use of.*—
*Contracts.*—*Confiscation.*—If the owner of a telephone exchange
were compelled to grant the use of his exchange to the patrons
of other exchanges, it would destroy his right of contracting with
subscribers for the use of his own exchange, and therefore con-
stitute a confiscation of his property. p. 630.

14. TELEGRAPHS AND TELEPHONES.—*Exchanges.*—*Physical Connec-
tions.*—The owner of a telephone exchange, is required to receive
and transmit telephonic messages from other exchanges; but he
is not required, apart from contract, to allow the owners of other
exchanges to connect their wires with his exchange. pp. 631, 632.

15. TELEGRAPHS AND TELEPHONES.—*Duty to Transmit.*—Telegraph
companies are required to transmit messages upon payment of a
reasonable price, whether such messages are received from indi-
viduals or from other telegraph companies. p. 631.

16. TELEGRAPHS AND TELEPHONES.—*Right of Physical Connection
with Exchanges.*—*Solvency.*—The fact that the owner of a tele-
phone exchange is solvent or insolvent neither gives nor denies
to him any right to compel the owner of another exchange to
permit the physical connection of their exchanges, so that the
patrons of the former may use the lines of the latter. p. 634.

17. COURTS.—*Progress.*—*Adaptations.*—*Justice.*—The law must pro-
gress with civilization, and when new conditions arise, the law
applicable thereto must be applied. p. 635.

18. TELEGRAPHS AND TELEPHONES.—*Physical Connection of Ex-
changes.*—*Contracts.*—*Discrimination.*—The owner of a telephone
exchange who, by virtue of contracts, permits the owners of other
exchanges the right to make physical connection with his ex-
change, may not refuse connection, on similar terms, to the plain-
tiff for his exchange. pp. 636, 640.

19. TELEGRAPHS AND TELEPHONES.—*Physical Connections of Exchanges.—Contracts.—Abrogation.*—Where the owners of two telephone exchanges enter into a "working" agreement of indefinite duration, whereby the patrons of such exchanges are entitled to the use of the services of both, such owners cannot abrogate such agreement and refuse such service. pp. 636, 638.

20. CONTRACTS.—*Kinds.—Breach.—Remedy.—Specific Performance.*—The remedy for the breach of certain kinds of contracts is an action for damages, and for others, specific performance. p. 636.

21. MANDAMUS.—*Enforcement of Contracts.—Public Duty.*—Mandamus does not lie to enforce a purely private contract, but does lie to enforce one, where the law imposes a duty requiring the performance thereof. p. 637.

22. CONTRACTS.— *Consideration.— Telephones.— Exchange Connections.*—A contract whereby the owner of a telephone exchange permits the patrons of another exchange the use of the service of his exchange in consideration of a like service to his patrons by the owner of the other exchange, is supported by a sufficient consideration. p. 637.

23. CONTRACTS.— *Circumstances.— Construction.*— In construing a contract the circumstances, the character of the business affected, and the object to be attained, should be considered. p. 637.

24. TELEGRAPHS AND TELEPHONES.—*Toll Lines.—Contracts.—Discontinuance.—Notice.*—The patrons of a telephone exchange have no such interest in the use of a separate toll line from their exchange to a distant point as will prevent the termination of a contract between the owner of the exchange and the owner of such toll line, where the contract provides for a termination thereof by either party upon thirty days' notice, such patrons being required to take notice of the provisions of such contract. p. 639.

25. EVIDENCE.— *Judicial Notice.— Switch.— Telephones.*— Courts take judicial notice that telephone connections are made by means of a device denominated a switch. p. 641.

26. TELEGRAPHS AND TELEPHONES.— *Discriminations.*— Telegraph companies must furnish service upon equal terms to all. p. 642.

27. MANDAMUS.—*Other Adequate Remedy.*—Mandamus does not lie where there is another adequate legal remedy. p. 642.

28. TELEGRAPHS AND TELEPHONES.—*Physical Connection of Exchanges.—Dispute as to Amount Due as Tolls.—Excessive Payment.—Recovery.*—Where the owner of a telephone exchange disputes the charge made by the solvent owner of another exchange with which the former's exchange is physically connected, it is the former's duty to pay such charge under protest and bring an action to recover the excess; otherwise the latter is justified in disconnecting his exchange. pp. 642, 644.

29. TELEGRAPHS AND TELEPHONES.—*Excessive Charges.—Recovery of.—Voluntary Payment.*—The excess above reasonable rates, charged by a telephone company, may be recovered, such payment being involuntary. p. 643.

30. PLEADING.— *Complaint.— Conclusions.— No Other Adequate Remedy.*—In an action in mandamus, an allegation in a complaint that the plaintiff had no other adequate legal remedy, is a conclusion. p. 644.

From Fountain Circuit Court; *Lucas Nebeker,* Special Judge.

Action by The State of Indiana, on the relation of Frank J. Goodwine, against Ira Cadwallader. From a judgment for defendant, plaintiff appeals. *Affirmed.*

*Charles R. Milford,* for appellant.
*McCabe & McCabe,* for appellee.

MYERS, J.—Appellant's relator instituted this action in the Warren Circuit Court on January 23, 1907, by a complaint in two paragraphs, and then filed an affidavit for a change of venue from that county, pending which, defendant filed a demurrer for want of facts to constitute a cause of action, to each paragraph of the complaint. The venue was changed to Fountain county, where such demurrer was sustained, and exception reserved by relator, and on his motion, third and fourth paragraphs of complaint were filed in that court. A demurrer for want of facts, addressed to each additional paragraph of complaint, was sustained and exception reserved; and, refusing to plead further, judgment was rendered that relator take nothing by his complaint, and for costs. Error is assigned as to each of these rulings.

Appellant here states that his whole case "is set forth in paragraphs three and four of the complaint," so that we have not considered the first and second paragraphs.

The substance of the third paragraph of complaint is that appellant's relator and appellee are separate owners of individual telephone exchanges in the town of West Lebanon, Indiana, established under public franchises granting the

use of the streets and alleys of that town, and the public highways leading therefrom, and holding themselves out to the public as operators of telephone exchanges for hire without discrimination; that their plants have for more than two years been physically connected, so that the patrons of each could converse directly through their respective exchanges; that this arrangement was made under a verbal contract, called a "working agreement," that each would render telephone service to the patrons of the other, both local and toll, through their respective exchanges, the consideration of which agreement was the mutual rendition of service to the patrons of each other, both local and toll, except as to the use of the toll line between West Lebanon and Danville, Illinois, owned by appellee, as to which there was a later contract between the parties, partly written and partly oral, by which appellee was to serve relator's patrons, and the prices of service to be charged by each were fixed, and relator was to pay appellee fifty per cent of the revenue received by relator from his patrons; that there was no agreement as to terminating the first agreement under which the connection was made or as to how long it should continue; that the service had been furnished for two years, but the contract as to Danville, Illinois, provided that either party might terminate it on thirty days' notice; that relator had 250 patrons and appellee 150 patrons in West Lebanon and the surrounding country; that each of them had long distance connection with several other towns, but neither had such connection with the same towns, so that each was dependent upon the other for connection with those towns, and they had for two years furnished direct service to those towns through their respective exchanges; that they were competitors for business, and the exchanges in the other towns were competitors with them in the same business in the towns and in the country surrounding them, and they had numerous connections with other exchanges and towns, and in the country around those towns, all operating under

public franchises; that appellee's exchange has connection with Williamsport, Ambia and Boswell, towns having, respectively, populations of 1,200, 600 and 1,000, and telephone patrons to the number of 375, 250 and 400, respectively, with none of which relator had telephone connection, and his patrons, and the patrons of the exchanges of those towns, were served through appellee's exchange, through which the connection for each of said exchanges and their patrons with each other and with relator's exchange and his patrons was made, and had been carried on for two years before the institution of this action; that large numbers of persons had become patrons through these connections, and an extended telephone connection between the patrons of each built up and established, and that relator had faithfully performed all of his part of the agreement, under which the original connection of the two plants was made, and had been operated for two years; that shortly before the institution of this action a dispute had arisen between relator and appellee as to the amount due to appellee from relator, growing out of the connection with the Danville plant; that relator had tendered the amount he admitted to be due, but appellee refused to receive it, claiming a greater amount, and on December 27, 1906, he served notice on relator of his intention to discontinue service to him and his patrons by a fixed time, unless the amount claimed by him to be due should be paid by that time, and this being refused, and the time having passed, appellee has refused and still refuses to furnish on demand to relator and his patrons the local and toll service to and with points and persons, to and with which and whom appellee could and relator could not otherwise obtain telephone service than through appellee's plant, and that such service was embraced in the original agreement. It is alleged that an offer was made to comply with all reasonable rules and regulations then or thereafter established by appellee for the operation of his plant, showing the inconvenience to the public and special

injury to relator as owner of the one plant, demanding damages, and that appellee be required to furnish relator and his patrons service by direct communication through appellee's plant under such rules and regulations as appellee might establish.

The fourth paragraph is substantially the same in its allegations as the third, except that no reference is made to the alleged "working agreement," or the agreement as to the Danville connection, or the notice of December 27, 1906, but is grounded upon the allegations that for more than two years each of them has been, and is now, carrying on the business for hire for the public generally, and holding himself out to the public as ready to serve all without discrimination, and that each is conducting his business under a public franchise from the town of West Lebanon for the use of the streets, alleys, and public places, and on the highways between said town, and adjoining towns and cities; that for more than two years last past the switchboards of the telephone plants of relator and appellee have been connected, and are now connected, by which the patrons of each have interchangeable local, and long distance service, and that during all that time said connection existed with the consent of both parties; that the telephone facilities furnished by the telephone plants in the towns of Ambia, Williamsport and Boswell are substantially the same as those furnished by the parties hereto to their patrons.

Appellee insists that relator presents no question here, by reason of the form of the assignment of error, which is,

1. that "the court erred in sustaining appellee's demurrer to the third paragraph of the relator's complaint," and the same as to the fourth, on the ground that it does not direct the assignment to the specific circuit court in which the ruling was had.

An assignment of error as to a ruling in a designated court presents no question as to an error which may have

been committed in another court. Appellee relies on 2. the case of *Chicago, etc., R. Co.* v. *Walton* (1905), 165 Ind. 642, and cases cited, in which it is held that an assignment that the Laporte Superior Court erred in overruling a demurrer, the record showing that the Lake Superior Court alone made the ruling, presents no question. This case does not fall within the rule upon which that case and kindred cases were decided, but within the specific exception stated in the case, and disclosed by the rule in *Mc-Keen* v. *Porter* (1893), 134 Ind. 483.

Appellee has also sought to dismiss the appeal, because, since the judgment was rendered, relator, as disclosed by affidavit, has sold and delivered possession of his tele- 3. phone plant to a corporation, and has no other interest than as a part stockholder and mortgagee. The affidavit discloses that relator has a mortgage on the tangible property sold. This action is not only to compel appellee to permit the use of his telephone plant and connections by relator, but also for damages, which is an entirely separate and distinct matter from the mandatory relief asked, and it is not pretended that this claim was assigned, if it could be.

Aside from this proposition, the statute itself is controlling. Section 272 Burns 1908, §271 R. S. 1881, provides that "no action shall abate by the death or disability of a party, or by the transfer of any interest therein, if the cause of action survive or continue. * * * In case of any other transfer of interest, the action shall be continued in the name of the original party; or the court may allow the person to whom the transfer is made to be substituted in the action." The motion to dismiss the appeal must be denied. See, also, *Tate* v. *Hamlin* (1895), 149 Ind. 94; *Shedd* v. *Disney* (1894), 139 Ind. 240.

Relator urges the sufficiency of the third and fourth paragraphs of the complaint on the grounds: (1) That telephone companies are subject to the rule governing common carriers, and are bound to furnish equal facilities to all per-

State, ex rel., *v.* Cadwallader—172 Ind. 619.

sons or corporations belonging to the classes which they un-
dertake to serve, and that this duty exists independently of
any constitution or statute; (2) that telephone companies
are subject to legislative control; (3) that property devoted
to public use becomes a legitimate subject of legislative con-
trol; (4) that state regulation and control of property de-
voted to a public use is not the taking of property for a pub-
lic purpose within the meaning of the Constitution of the .
state, nor an interference with the rights of private prop-
erty; (5) that private persons engaged in the telephone
business are under the same duties and obligations as cor-
porations engaged in the same business; (6) that debt alone,
where the debtor is solvent, is not a sufficient reason for re-
fusal to furnish telephone service; (7) that the use of tele-
phones has become a commercial and social necessity, to the
extent that they are, in legal contemplation, devoted to a
public use; (8) that where there is a contract between tele-
phone exchanges as to exchange service, and no period of
time is mentioned, the service must be furnished as long as
the party is in the business. As against these propositions,
appellee contends: (1) That the third paragraph, being
founded upon a contract, which provides for its abrogation
upon thirty days' notice, specific performance will not be
decreed for want of mutuality, and that it is also bad for
the reason that it shows that the service was discontinued by
reason of nonpayment of tolls, and that by paying the claim
under protest he could have recovered it in an action at law,
if erroneous, and that he cannot resort to the extraordinary
writ of mandate; (2) that neither paragraph of the com-
plaint is sufficient because (a) the common-law obligations
of a connecting common carrier are the same as those owing
to an individual, and whatever rights, beyond those belong-
ing to a natural person, are claimed by one company against
another, operating a connecting line, must arise out of spe-
cial contract; (b) one telephone company or the individual
owner cannot compel another to permit the physical appli-

cation of his plant for the accommodation of the former's patrons, any more than one railroad can compel another road to permit the use of its tracks for the former's trains.

The third paragraph is based upon an alleged "working contract," presumed to be verbal, as no written agreement is pleaded. The physical connection between the two plants was made under an express contract, the consideration for which, as alleged, was, the return service rendered by each to the patrons of the other. This action was instituted January 23, 1907, and it is alleged that for more than two years the switchboards of the two plants had been connected, and during all of that time and at the commencement of the action there had been in force the alleged "working agreement." The Danville, Illinois, contract was dated February 7, 1906, so that it cannot fairly be inferred that the plants were connected under that agreement.

We are, therefore, bound to assume that the connection of these plants was with relator's assent, and was under the alleged verbal working agreement the only material portion of which, as alleged, is that each agreed to furnish the patrons of the other facilities for telephonic communication, the consideration being the return service rendered to their respective patrons. Whether this agreement lacks mutuality, depends not upon its terms wholly, but upon its terms and upon the question whether, as a matter of law, either can abandon it at will; if so, its specific performance cannot be compelled; if not, it may be. *Fowler Utilities Co.* v. *Gray* (1907), 168 Ind. 1, 7 L. R. A. (N. S.) 726, 120 Am. St. 344, and cases cited.

So far as the specific terms of the agreement are concerned, it is silent as to the question of continuation or discontinuation, and ordinarily either party might discontinue at pleasure, and the other be remitted to his remedy for damages. This, we think, must be so, unless the business itself is so impressed with a public charac-

ter, and the public interest is such that the court may say, as a matter of law, that it may not be discontinued, and specific performance be decreed upon that ground.

A telephone company doing a general telephone business is a common carrier of news. *Central Union Tel. Co.* v. *Fehring* (1896), 146 Ind. 189; *Central Union Tel. Co.* v. *Bradbury* (1886), 106 Ind. 1; *Central Union Tel. Co.* v. *State, ex rel.* (1889), 118 Ind. 194, 10 Am. St. 114.

Individuals may conduct this business, and are given by statute the same authority as corporations to "set and maintain their poles, posts, piers, abutments, wires and other appliances or fixtures, upon, along, under and across any of the public roads, highways and waters of this State, outside of cities and incorporated towns," with certain restrictions. §5796 Burns 1908, Acts 1903, p. 204; *Magee* v. *Overshiner* (1898), 150 Ind. 127, 40 L. R. A. 370, 65 Am. St. 358. By analogy and by statute, where public telephones are constructed or maintained for profit, or charges are made for their use, individuals conducting telephone exchanges are subject to the same obligations as corporations with respect to equal facilities, equal charges, and freedom from discrimination and partiality, as against any person, persons, or corporations, in like situation, conducting a lawful business. §5802 Burns 1908, Acts 1885, p. 151, §2.

This duty does not amount to an absolute requirement that one company or individual shall furnish the patrons of another the use of its or his exchange and lines, unless it has been voluntarily undertaken, so that it or he may not afterward discriminate in classification. Patrons of the corporation or individual contracted with are bound to know that, in the absence of an undertaking so to do, another corporation or individual is not bound to subject its or his property to their use, by the direct or unrestricted use of its or his lines.

Telephone exchanges, conducted for the benefit of the public for compensation, may fairly be said to be impressed with

a public interest, but their public character depends upon the nature, and not the extent of their business.

Each agency or exchange conducted by a corporation or individual is separate and distinct from all others, with respect to the conduct of its business, and in its relations to the public, and the owner of such exchange owes duties of an impartial character, and free from discrimination, to all who are like circumstanced.

That it is a *quasi*-public agency, by reason of its being impressed with a public interest, is only so to the extent that the owner thereof owes an impartial duty to all, having respect to the capacity of his exchange and his undertakings made upon his own initiative. If this were not true, it will readily be seen that any one who saw fit could, by establishing a telephone exchange, and procuring few or many patrons, or by the dwindling to small proportions of a once extensive field of operations which existed when the relation began, and which furnished the consideration, but from which there would be practically no return for the service of the other, insist upon connection with and service through indefinite extensions, and produce an inequality which in itself would be inequitable and lacking in consideration.

If the abstract right to such connection were once admitted to exist, it would not depend upon the number of patrons, but upon the question of individual right. It must be based upon that right if it exists at all in the absence of contract, express or implied, for there would be no means of determining when the particular plant, exchange or property becomes, or ceases to be impressed with, a public interest. It could only be thus impressed by the character of the use, and not by the number of users. The effect would be the destruction of the private right of contract, and it would amount to a practical confiscation of another's property.

State, ex rel., *v.* Cadwallader—172 Ind. 619.

The business of a common carrier is impressed with the common-law duty of receiving from a connecting carrier and transporting commodities, the same as if offered 14. by an individual. And so here, relator and his patrons through him, upon compliance with the reasonable rules and regulations, and the payment of the compensation which is ordinarily charged to others, would be entitled to have his and their messages handled and transmitted by appellee's exchange. But that is a very different thing, in the absence of contract, from the demand that a physical connection shall be maintained, involuntarily and as of right, when, from the character of the business itself, the control of appellee's plant would be in a measure wrested from him, and subjected to the administration of another, or many others.

The private right of property and of contract may not be thus interfered with. We are treating now only of the relations of these *quasi*-public utilities, where there is no statutory regulation, and no contractual relation, express or implied.

The telegraph cases are not precisely in point, by reason of the different means of communication. In one, the intervention of skilled employes is necessary in transmit-15. ting the news or information; in the other, no such intervention is necessary; the act of transmission is coëxistent with the opportunity and right, and is self-executing. But it has never been held that a telegraph company is bound to transmit beyond its own lines, by another company's initiative, in the absence of contract or statute, though it is bound to deliver to the connecting carrier, and the latter is bound to receive and transmit, upon compliance with reasonable terms and regulations. *United States Tel. Co.* v. *Western Union Tel. Co.* (1865), 56 Barb. 46; *Baldwin* v. *United States Tel. Co.* (1867), 6 Abb. Pr. (N. S.) 405.

The fact that no case has arisen, so far as we have been

able to discover, wherein the claim was made as here, notwithstanding the long-time operation of telegraph lines, that one line had a right, independently of contract or statute, to the physical use of another line, is a fair index of the fact that the profession has not deemed so radical a rule as being within the range of the rights of corporations or individuals, with respect to the management of their property. Strong analogies may be found in the railroad connecting-carrier cases. *Louisville, etc., R. Co.* v. *Central Stock Yards Co.* (1909), 212 U. S. 132, 29 Sup. Ct. 246, 53 L. Ed. 441.

In *Shelbyville R. Co.* v. *Louisville, etc., R. Co.* (1885), 82 Ky. 541, it was held that one railroad company connecting with another, one-half mile from an established station of the latter, though there had been at one time an agreement between the two companies, which had been abrogated, by which the cars of each had been hauled over the road of the other, and the complaining company at the time the suit was brought was running its cars on the half-mile of track of the other company, by permission, did not authorize the connecting company to demand that the one company should permit the use of its engines and cars on the half-mile of track. To do this, says that court, would be ''destructive of appellee's franchise, and it would be to allow, without even the pretense of legislative sanction, the one company to take the property of another, and appropriate it to its own use.''

The Baltimore and Ohio Railroad Company was chartered in 1826 by the State of Maryland, without any reservation of the right of amendment or repeal. One section of the charter provided that no use of this company's roads should be made by any other company without the consent of the then chartered company.

In 1874 the legislature of Maryland passed an act requiring all railroads within that state to permit the crossing or connecting roads to use not to exceed five miles of track of another line, and this was held to be an invasion of the char-

tered rights of the Baltimore and Ohio Railroad Company, not only upon the ground of its being a violation of contract rights arising under the charter, but, specifically, because the unrestricted control of one corporation over its property cannot be denied under such charter. *Pennsylvania Co.* v. *Baltimore, etc., R. Co.* (1883), 60 Md. 263.

In *Atchison, etc., R. Co.* v. *United States* (1876), 93 U. S. 442, 23 L. Ed. 965, under an act of congress, granting lands to aid in the construction of a railroad, and providing that ''said railroad shall be and remain a public highway for the use of the government of the United States, free from all toll, or other charges for the transportation of any property or troops of the United States,'' it was held that such provision means transportation by the United States by its own means; but that when transportation was required to be made by the railroad company, it was entitled to compensation.

The constitution of Colorado, providing that ''all individuals, associations and corporations shall have equal rights to have persons and property transported over any railroad in this state, and no undue or unreasonable discrimination shall be made in charges or facilities for transportation of freight or passengers within the State, and no railroad company, nor any lessee, manager, or employe thereof, shall give any preference to individuals, associations, or corporations in furnishing cars or motive power'' (*Atchison, etc., R. Co.* v. *Denver, etc., R. Co.* [1884], 110 U. S. 667, 4 Sup. Ct. 185, 28 L. Ed. 291), imposes no greater obligation than the common law imposed; and one railroad connecting with another, cannot, by the fact of a physical connection, at any point it pleases, require the line with which it connects, in the absence of some constitution, charter, or statutory regulation, to establish stations for the interchange of freight and passengers at such connections.

Conceding that corporations and individuals operating telephones are subject to legislative regulation, the legislature has made no attempt at requiring connection between

telephone exchanges owned or operated by distinct corporations or individuals.

The fact that it has not done so, argues strongly that with due regard to private rights of property, and the well-defined obligations of common carriers, the matter of physical connections of differently owned systems is a matter well left to contract. Neither will it do to predicate the right of maintaining such connection on the ground of the solvency of one of the parties against whom a debt may be owing, growing out of the operation of the plant, when there is a controversy, as here, over an amount; for if solvency furnished that basis, insolvency by the same reasoning would deny it, and if the property is impressed with public rights, the public could not be affected by such facts or conditions. The result would be, that the courts would be called upon to take from the possession of the owners both plants, and operate them, simply because of a controverted indebtedness between the parties, on the one hand as to an amount due, on the other, as to the other party's solvency. In other words, if two or more plants were so affected by a public interest as that either party could insist that they be operated together, to furnish public service, then, necessarily, the insolvent would drag in the solvent concern. It is one thing to furnish service to all without discrimination, but quite another thing to dictate or control the means of service by independent agencies. The public duty of impartial service may be required, not only by statutory regulation, but, independently of statute, as a common-law obligation, but the agency may not be arbitrarily controlled. It would be quite as consistent to claim that, in the modern agency of transportation by electricity, one interurban or street railroad company should be permitted to run its cars upon the line of an independent, connecting or parallel carrier. We apprehend no such common-law right could be lawfully or consistently claimed.

State, ex rel., *v.* Cadwallader—172 Ind. 619.

That telephone exchanges are impressed with a public use as common carriers of news is settled in this State. That they must furnish impartial service, without discrimination to all persons in the same or similar classes, is, we believe, everywhere the rule. *Hockett* v. *State* (1886), 105 Ind. 250, 55 Am. Rep. 201; *Central Union Tel. Co.* v. *State, ex rel.* (1889), 118 Ind. 194, 10 Am. St. 114; *Central Union Tel. Co.* v. *State, ex rel.* (1890), 123 Ind. 113; *Central Union Tel. Co.* v. *Fehring* (1896), 146 Ind. 189; *Central Union Tel. Co.* v. *Bradbury* (1886), 106 Ind. 1; *Commercial Union Tel. Co.* v. *New England Tel., etc., Co.* (1888), 61 Vt. 241, 17 Atl. 1071, 15 Am. St. 893, 5 L. R. A. 161 and notes.

There is, however, as we conceive, a marked difference between furnishing initial, independent service, through or by means of an independent exchange, and secondary service by an interchange of business, or by means of connecting two or more plants; so that for all practical purposes of the users they constitute but one system, for that in effect, as we have seen, in the absence of contract, would amount to practical confiscation of private property.

The law must adapt itself to the varying conditions and progress of civilization, and the new conditions which arise and are brought within the range of judicial investigation. The courts must solve the questions thus arising by analogy to the settled maxims of the law; and, while recognizing the public character of the business of conducting telephone exchanges for public service, must determine not only the rights of the public with respect to these agencies, but also the relations which the independent agencies sustain to each other. We think that upon the subject of distinct telephone exchanges, and the duties owing among each other, and in the absence of statutory regulation of the subject, the analogies furnished by the railroad cases, and their reasoning with respect to connecting carriers, fix the

true legal relations of such public agencies, and comport more with the idea of preserving individual rights of property, than to hold that they are bound, in the absence of statute or contract, to furnish each other's patrons with unrestricted service, by each submitting its, or his, exchange to the other. What we have thus far said applies to the common-law features of the question.

A more serious question arises with respect to the alleged contracts, and the alleged fact of appellee's furnishing other exchanges the same service as is requested by relator, as presented by the third paragraph of complaint, and the question presented by the fourth paragraph, singly, that appellee is furnishing, through a physical connection made by mutual consent, the same service to other exchanges which relator has requested. Such physical connection cannot be required as of right, but if such connection is voluntarily made by contract, as is here alleged to be the case, so that the public acquires an interest in its continuance, the act of the parties in making such connection is equivalent to a declaration of a purpose to waive the primary right of independence, and it imposes upon the property such a public status that it may not be disregarded. *Mahan* v. *Michigan Tel. Co.* (1903), 132 Mich. 242, 93 N. W. 629.

The force and effect of the working contract, alleged in the third paragraph of the complaint, does not imply any right of withdrawal by either party; on the contrary, we think such agreement fixes a status which can only be terminated by the retirement from the business of one or the other of the parties.

There are many classes of contracts which one of the parties may abrogate, and the other party is then driven to his remedy in damages for the breach. There are others where, as between purely private persons, the agreements are of such a character that specific performance will be enforced against the unwilling party, and another class wherein the rights of the public have become so

involved, by reason of the public character of the subject-matter, that one party may not recede, as in case of public utilities, such as gas, water, light, sewerage, and the like. *Indiana, etc., Gas Co.* v. *State, ex rel.* (1902), 158 Ind. 516, and cases cited at page 519, 57 L. R. A. 761.   There is still another class where specific performance will not be decreed by reason of lack of mutuality ; as, for example, in that class of cases where there is a reserved right in either party to terminate the agreement at will.   *Fowler Utilities Co.* v. *Gray, supra.*

Mandamus will not lie to enforce a purely private contract, but when the contract becomes impressed with a public character, or the subject-matter is impressed with a public duty, or a duty imposed by law, it will lie. 19 Am. and Eng. Ency. Law (2d ed.), 742.

The agreement under examination is upon a sufficient consideration, in the fact of the return service rendered by each of the parties to the patrons of the other.   The matter may be much simplified by turning the proposition about, and inquiring what would be the rights of appellee as against relator, could there be any question of his right to have the service continued?   The solution of that question depends upon the other question, whether there would be a right in relator to discontinue service at will, and that in turn involves the force and effect of the agreement itself, and it must be read in the light of the circumstances, the character of the business, and the object to be attained.   We think it certain that the property of each of the parties is impressed with such a public interest that neither can disregard it.

The statute (§5796 Burns 1908, Acts 1903, p. 204) confers upon individuals the right to place and maintain poles, posts, etc., on the public highways.   The allegations of the complaint are that both parties are operating under public franchises in the town of West Lebanon and other towns, and on the public highways.   They are thereby

given rights of a *quasi*-public nature, and elect to give the property the status of a public interest; besides, as alleged, they are conducting a public business, in which they must serve all in the same class, without partiality or discrimination.

"Where private property is, by the consent of the owner, invested with a public interest or privilege for the benefit of the public, the owner can no longer deal with it as private property only, but must hold it subject to the rights of the public in the exercise of that public interest or privilege conferred for their benefit." *Allnutt* v. *Inglis* (1810), 12 East 527. The doctrine of this early case is the acknowledged law. It is stated somewhat differently in *Munn* v. *Illinois* (1876), 94 U. S. 113, 24 L. Ed. 77, where it is said: "Property does become clothed with a public interest when used in a manner to make it of public consequence, and affects the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control." It is alleged in this complaint that relator has 200 subscribers to his local line, and appellee has 150, and that they both have toll connections with other towns.

In *Campbellsville Tel. Co.* v. *Lebanon, etc., Tel. Co.* (1904), 118 Ky. 277, 80 S. W. 1114, 84 S. W. 518, it was held that the Kentucky constitution of 1891 (§199), requiring telephone companies, operating exchanges in different towns, to receive and transmit each other's messages, did not require this to be done by physical connections. The parties did make physical connection of their exchanges under a written contract with respect to the disposition of the tolls, but the contract was silent upon the question of the term of existence of the contract, and it was there insisted

that it could be terminated at the will of either party. This contention was denied, the court saying: "The fact that no time is fixed in the contract for which it shall endure is seized upon as affixing it to that class of contracts that run at the mutual will of the parties, and that may therefore be terminated when either of them elects to do so. The intention of the parties at the time of the making of the contract, to be gathered from its terms, and the surrounding circumstances, is the thing to be sought for and enforced, if enforcible."

These views seem to us to be of controlling force here. These parties have gone to large expense in constructing their plants, both in, and for many miles in the country around, West Lebanon, and to other towns and cities, presumably upon the ground that such extensions are profitable to each, and the more so by reason of their arrangements for interchange. It cannot reasonably be inferred that either of them contemplated that the other could at his will discontinue that arrangement. Each has doubtless extended his field of operations by reason of their arrangement for interchange, and the very nature of the business is a continuing one.

The contract respecting the toll line between West Lebanon and Danville, Illinois, is entirely separate from the alleged "working agreement," as to all other connections and business. It provides for discontinuance by either party on thirty days' notice, and we think as to that agreement, even though between common carriers of news, the patrons of each were bound to know that the physical connection must have been made under contract, and to know its terms as to liability to discontinuance. Such contract is not violative of public policy, being similar to cases where common carriers are held not to be obligated to transport the cars and employes of private owners, but may do so by restricted contracts which they cannot make as to carriage of freight or passengers in their own

conveyances. Persons thus transported are bound to take notice of such contracts, and are bound by them. *Cleveland, etc., R. Co.* v. *Henry* (1908), 170 Ind. 94, and cases cited; *Pittsburgh, etc., R. Co.* v. *Mahoney* (1897), 148 Ind. 196, 40 L. R. A. 101, 62 Am. St. 503, and cases cited; *Louisville, etc., R. Co.* v. *Keefer* (1896), 146 Ind. 21, 38 L. R. A. 93, 58 Am. St. 348, and cases cited; *Baltimore, etc., R. Co.* v. *Voigt* (1900), 176 U. S. 498, 20 Sup. Ct. 385, 44 L. Ed. 560. The ground of refusing service was not notice under that contract, but, as alleged, was by reason of nonpayment of a disputed indebtedness growing out of that contract, so that we perceive nothing in the case to which that agreement has any relevancy.

There is still another feature of the case which is of controlling importance.

In each of the two paragraphs of complaint it is averred that the two exchanges have long distance connections with other named towns, which are shown to have considerable population, and are some distance from each other and from West Lebanon, and it is averred that appellee is furnishing connected, immediate service in West Lebanon to separate exchanges in those towns, and to the patrons of such exchanges both local and toll, of the same class and character that he denies to relator. This fact not only furnishes added evidence of the impression of this property with a public interest, but discloses that appellee discriminated against relator, in violation of his statutory and common-law duty.

The fourth paragraph of complaint eliminates all questions of contract, except a physical connection by agreement, and stands upon the common-law grounds for relief. What we have said as to the third paragraph applies to the fourth, except in respect to the contract feature of the former.

It will be seen from the allegations that the physical connection between the plants has not been severed; that relator

has offered to comply with all reasonable rules and regulations fixed by appellee, and that the service is demanded to noncompeting points, and those points and persons with which and with whom relator and his patrons have no other means of communication, and that appellee is furnishing to other exchanges in West Lebanon direct connection and communication with their patrons to other exchanges, and the same service requested by relator. Appellee has thus fixed a classification of those similarly situated and affected. *Delaware, etc., Tel. Co.* v. *State, ex rel.* (1892), 50 Fed. 677, 2 C. C. A. 1.

The allegations also show consent to the connection. Having elected to furnish direct physical connection between, and immediate communication with and for other exchanges and their patrons through his exchange in West Lebanon, appellee cannot exclude a like service to an exchange in the same town, for the reason that he is compelled to treat all of the same class alike, and there can, it seems to us, be no rational ground for excluding one exchange, when others are admitted. The act of admitting the connection alleged, is equivalent to a declaration that all will be admitted to the connection, on the terms and conditions imposed as to one or more. Appellee has admitted to his exchange the exchanges of Ambia, Boswell, Williamsport and Danville.

Not only the patrons of relator but those of appellee, and the public at large, have an interest in the matter. Appellee could have refused to connect his plant, and to furnish direct or immediate service to relator's patrons, and to other exchanges and their patrons, but did not so refuse, but he and they opened their exchanges to all applicants. Could it be insisted, other things being equal, that appellee could refuse connections from Ambia, and accept those from Boswell? We take notice, as a matter of science, that the telephone connections with the other towns and with appellee's patrons are made through a device

known as a switch, so that the conditions of connection are the same. In numerous cases it has been held, with reference to telegraph lines, that if service is furnished to one, all in the same town or city are entitled to the same service, not upon the ground of a primary right, but because, having elected to furnish the service to one, the same obligation arises in favor of all similarly situated. *Central Union Tel. Co. v. State, ex rel.* (1890), 123 Ind. 113; *Central Union Tel. Co. v. State, ex rel.* (1889), 118 Ind. 194; *Central Union Tel. Co. v. Bradbury, supra; Williams v. Maysville Tel. Co.* (1904), 119 Ky. 33, 82 S. W. 995; *State v. Delaware, etc., Tel. Co.* (1891), 47 Fed. 633; *Commercial Union Tel. Co. v. New England Tel., etc., Co., supra,* and notes; *Chesapeake, etc., Tel. Co. v. Baltimore, etc., Tel. Co.* (1887), 66 Md. 399, 7 Atl. 809, 59 Am. St. 167.

We have given the cause this much attention because of its public interest and character, but the judgment must be affirmed upon other grounds.

Relator discloses that the reason for refusing the service was a dispute between the parties over a question of indebtedness. Even if it were an individual matter between the parties, we think relator has mistaken his remedy. In order to invoke the extraordinary remedy of mandamus, he must have been without other adequate and efficient remedy.

Being engaged in a *quasi*-public occupation, there is all the more reason why his duty to the public should not be a diminished one, because of a private controversy over the question of whether a greater or lesser sum is due from him, some sum being conceded to be due. The fact that he is solvent is of no consequence. It will be presumed that appellee is also solvent, and we think that it was the clear duty of relator to pay under protest the demand made upon him, then seek an adjustment of the matter by the ordinary process of law, and thus avoid this controversy. *Irvin v. Rushville, etc., Tel. Co.* (1903), 161 Ind. 524; *Rush-*

*ville, etc., Tel. Co.* v. *Irvin* (1901), 27 Ind. App. 62; *State, ex rel.,* v. *Nebraska Tel. Co.* (1885), 17 Neb. 126, 22 N. W. 237, 52 Am. Rep. 404; *State, ex rel.,* v. *Citizens Tel. Co.* (1900), 61 S. C. 83, 39 S. E. 257, 55 L. R. A. 139, 85 Am. St. 870.

We can perceive no distinction in principle between a case where a set-off greater than the amount of toll is claimed to be due, and a controversy over the amount due from the operation of the exchange, especially when that controversy arises respecting an agreement which in any event affects only the Danville line, and is collateral to, and, disconnected from the main operating agreement. That contract might in any event be annulled on thirty days' notice, but the main agreement is affected with no such condition, and we have held that the tolls must be paid. *Irvin* v. *Rushville, etc., Tel. Co., supra.*

If appellee were insolvent, and a payment of more than the amount justly due were demanded, the recovery of which on payment could not be had, a different question might be presented; for in such case it would be an arbitrary exaction as a condition of service. But payment of a protested claim, as a condition of furnishing a service which it is appellee's duty to perform, and essential to carrying on a business, and especially a public business, could not affect the right of recovery of an unjust exaction, as being a compulsory payment. Appellee had the power to refuse the service, and relator was under a necessity to obtain the service for his patrons. They, therefore, were not treating upon equal terms, and relator had no choice in the matter. The refusal of service by appellee is very analogous to a distraint of property. Refusal of service was equivalent to taking and holding relator's property. It would not be a case of payment under threatened legal proceedings or mistake of law or facts, or without knowledge, but with full knowledge of the injustice of the claim, and in order to enable him to discharge a duty to the public

which he was under legal obligation to discharge, and which a controlling necessity and business exigency required that he should discharge. 22 Am. and Eng. Ency. Law (2d ed.), 619; *Louisville, etc., R. Co.* v. *Wilson* (1892), 132 Ind. 517, 18 L. R. A. 105; *LaFayette, etc., R. Co.* v. *Pattison* (1872), 41 Ind. 312; *Indiana, etc., Gas Co.* v. *Anthony* (1901), 26 Ind. App. 307.

Relator's averments that he had no other plain and adequate remedy, etc., are not allegations of fact, but conclusions, and they are controlled by the specific allegations by which it is disclosed that relator, upon payment of some sum of money in controversy, might receive all the consideration he is here demanding.

The court below did not err, and the judgment is affirmed.


## ON PETITION FOR REHEARING.

MYERS, J.—Upon the earnest petition of appellant, who insists that the original opinion would permit discrimination, by the possibility that telephone companies, and like public-service corporations or individuals, might make demands for unreasonable amounts, or amounts which the patron could not pay, as a condition of service, and make that a pretext for refusing service, we have again reviewed this case. We are asked to overrule *Irvin* v. *Rushville, etc., Tel. Co.* (1903), 161 Ind. 524, and *Rushville, etc., Tel. Co.* v. *Irvin* (1901), 27 Ind. App. 62. It is a sufficient answer to this insistence to say that arbitrary demands or exactions would, in and of themselves, amount to discrimination, and undoubtedly furnish grounds for the intervention of the courts; but we have no such case here. This is a dispute as to what sum relator owes appellee, growing out of relator's use of appellee's telephone line under a special contract under which relator occupies precisely the relation to appellee as any other patron. It is not shown that the amount demanded was arbitrary or unreasonable, but a sim-

ple controversy over the amount due for service, relator claiming to have tendered the correct amount, and appellee refusing it because not enough.

Suppose the situation should be reversed, and that appellee had received the amount tendered, he would then have been driven to a suit at law to recover what, if any, sum was due to him, and, if relator was in fact indebted to him, he would be put in the situation of furnishing service when relator was owing him for past service, and, if relator could do that, every patron of his plant could do the same, so that the question as here presented is simply one of honest difference as to a sum due, which, under the original opinion, we held must be adjudicated in some other method. To hold otherwise would, in effect, leave public service agencies to continue indefinite and forced service, and be compelled to maintain perhaps interminable and unlimited actions for their compensation, and this the policy of the law does not demand. The public has such an interest that efficient and prompt service, undiminished by depleted revenues, should be maintained.

The reasons for the rule requiring payment of the fixed charges to be made are well stated in the two cases last referred to. The very life and efficiency of relator's own plant might be menaced by a contrary holding. We think the original opinion correct.

The petition for a rehearing is overruled.